**<u>EXHIBIT 1</u>**

**Second Amended Complaint**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| TS EMPLOYMENT, INC., | Case No. 15-10243 (MG) |
| Debtor. | Chapter 11 |
| JAMES S. FELTMAN, not individually but solely as chapter 11 trustee for TS Employment, Inc., | |
| Plaintiff, | |
| v. | |
| KOSSOFF & KOSSOFF LLP and IRWIN KOSSOFF, | Adv. Proc. No. 18-1649 (MG) |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiff James S. Feltman, not individually but solely as chapter 11 trustee ("Trustee" or "Plaintiff") for the bankruptcy estate of TS Employment, Inc. ("TSE"), hereby states for his complaint as follows:

## NATURE OF THE ACTION

1.      This is an adversary proceeding by TSE's bankruptcy estate against Kossoff & Kossoff LLP ("K&K") and its principal, Irwin Kossoff ("Kossoff" and together with K&K, the "Defendants"), who performed and controlled substantially all of TSE's financial reporting, tax and accounting functions.  As a result of Defendants' conduct, TSE and its creditors suffered more than $100 million in losses before TSE ultimately filed for bankruptcy protection in February 2015.

2. Until its bankruptcy, TSE served as the professional employer organization ("PEO") for Corporate Resource Services, Inc. ("CRS") and its subsidiaries (the "CRS Subsidiaries" and, together with CRS, the "CRS Debtors"), a group of publicly traded staffing businesses. As the PEO, TSE was the employer of record for hundreds of thousands of temporary workers supplied under the CRS Debtors' contracts with their customers.

3. CRS experienced dramatic growth from 2010 to 2015 by offering its customers competitive pricing and financing options, which were attractive differentiators. CRS's ability to expand its business rapidly was in large part dependent upon accounts receivable financing provided by Wells Fargo and in part dependent upon purported financial accommodations made by TSE, including the forgiveness or deferral of more than $70 million owed to TSE under its PEO agreement with CRS.

4. TSE never had the capital or liquidity needed to make financial accommodations to CRS. TSE was operated in a manner that concealed a multi-year scheme to defraud the United States Treasury by systematically misreporting payroll tax obligations. This fraudulent and coordinated scheme required carefully managed financial reporting and false tax reporting activities which were performed and overseen by Irvin Kossoff.

5. Since TSE had no other means of creating working capital to provide financial accommodations, TSE "financed" its accommodations to CRS by willfully failing to pay federal employment taxes for TSE employees that were supplied to CRS customers, as well as other obligations. Moreover, most of TSE's funds were commingled in the accounts of its affiliate, Tri-State Employment Service, Inc. ("Tri-State" and collectively with its wholly-owned subsidiaries, "Tri-State Group"), where tens of millions of dollars were used for purposes unrelated to TSE. As a result, TSE ultimately failed to pay more than *$100 million* (exclusive of

interest and penalties) in federal employment tax obligations, as well as other non-tax obligations.

6.      From 2011 forward, TSE was insolvent and engaged in an unsustainable and woefully under-capitalized business.  TSE had no chief financial officer or treasurer, no accounting personnel and no employees of its own to carry out its core financial and accounting operations.  Instead, these functions were performed by Defendants, who ostensibly acted as Tri-State's and TSE's outside accountants but exercised direct, complete, and virtually exclusive control over the financial reporting systems and internal accounting functions of TSE.  These financial related duties included the preparation of federal and state payroll and withholding tax returns and the weekly determination of how much TSE would deposit with the United States Treasury to satisfy ongoing payroll tax obligations.

7.      Defendants controlled, maintained, and made adjustments to TSE's books and records and financial reporting systems and decided how to account for TSE's business activities.  Defendants also regularly exercised decisionmaking authority over financial matters involving TSE, Tri-State, and other Cassera businesses.  And it was Defendants—and not any other officers or employees of TSE or Tri-State—that prepared the journal entries hiding massive tax liabilities; prepared and filed TSE's inaccurate tax returns; provided information to TSE's auditors; and prepared false financial statements.  Defendants' actions hid TSE's financial condition from the outside world, thus permitting TSE to continue amass unpaid liabilities while its corporate life was wrongfully prolonged.

8.      Kossoff has admitted as much.  In an April 22, 2015 declaration filed with the Court, Kossoff conceded, among other things, that at the end of 2013, he made a journal entry "moving" $67 million in unpaid TSE payroll tax liabilities from TSE's books to Tri-State's

books, supposedly because Tri-State was going to pay those taxes. Defendants also prepared false tax returns for 2013 incorrectly stating that TSE's payroll taxes had been paid. As a result, TSE's 2013 year-end balance sheet and tax returns failed to reflect its massive insolvency and unpaid tax liabilities, and TSE was able to continue operations. Kossoff reversed that the $67 million journal entry for unpaid payroll taxes after the year end 2013 audit was completed as he knew that Tri-State had significant unpaid payroll tax obligations of its own and had no capacity to satisfy TSE's delinquent payroll tax obligations.

9. The Trustee brings this complaint against the Defendants to recover more than $100 million in losses that would have been avoided had Defendants not engaged in the conduct complained herein.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this is an adversary proceeding arising in and related to the chapter 11 case *In re TS Employment, Inc.*, Case No. 15-10243, pending in the United States Bankruptcy Court for the Southern District of New York.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

12. This adversary proceeding is not a core proceeding.

13. The Trustee consents to entry of final order or judgment by this Court.

## THE PARTIES

14. Plaintiff James S. Feltman is the chapter 11 trustee for TSE and the CRS Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for this region on February 27, 2015 and September 22, 2015, respectively.

15. Debtor TSE is a Florida corporation, with its principal place of business in New York. At all times relevant to this complaint, Robert Cassera ("Cassera") directly or indirectly

4

owned of 100% of the issued and outstanding stock of TSE, and held himself out as TSE's president.

16.     Defendant K&K, an accounting firm, is a limited liability partnership located in Goshen, New York.  K&K provided accounting services for TSE from 2010 through 2015, and provided accounting services for Tri-State Group entities and/or Cassera from 1995 until at least 2015.

17.     Defendant Kossoff is an individual residing in Boca Raton, Florida.  At all times relevant to this complaint, Kossoff was a principal of K&K, and was the lead partner for K&K's engagement with TSE and the Tri-State Group.

## FACTS

### The Staffing Business

18.     Tri-State is a New York corporation with its principal place of business in New York.  Cassera directly or indirectly owns 100% of Tri-State's issued and outstanding stock, and at all times relevant to this complaint was the president and a director of Tri-State.

19.     Cassera founded Tri-State in 1993 as a temporary staffing company.  The company grew in size over the next 15 years, including through acquisitions that became part of the Tri-State Group.  Over time, corporations within the Tri-State Group began to serve as the PEO for staffing businesses within the Tri-State Group, and for other staffing businesses owned by Cassera.

20.     By 2010, the Tri-State Group had become a national provider of staffing, recruiting, and consulting services, with a focus on light industrial services, clerical and administrative support and insurance related staffing.

21.     In 2010, Accountabilities, Inc. (one of the CRS subsidiaries), which at the time was directly or indirectly majority-owned by Cassera, completed a holding-company

5

reorganization and became a wholly owned subsidiary of CRS (incorporated the previous year); CRS became a publicly-traded company; and Cassera became the direct or indirect majority owner of CRS. Thereafter, CRS began pursuing a strategy of rapid expansion by acquiring businesses from Tri-State, Cassera and competitors.

22.     By the end of 2013, the CRS Debtors had more than 800 employees and operated in over 200 locations. CRS's gross revenue had grown from $120.9 million in fiscal year ending September 30, 2010 to $819.7 million in 2013. In 2013, the CRS Debtors placed approximately 150,000 temporary workers with approximately 5,000 customers.

23.     CRS's apparent success in large part derived from its ability to provide customers with temporary and seasonal workers at competitive rates, and its access to working capital to fund acquisitions and provide customer financing. The CRS Debtors were thus able to offer an expanding customer base—including a number of Fortune 500 companies—competitive pricing and short-term financing to help them to more evenly distribute the expense of seasonal staffing, an attractive differentiator from many other staffing companies.

24.     Much of CRS's access to liquidity and working capital was attributable to financial accommodations purportedly made by TSE.

25.     Pursuant to an agreement dated August 27, 2010 (the "PEO Agreement"), TSE agreed to provide PEO services to CRS. As the PEO, TSE was the co-employer of record for the hundreds of thousands of temporary or seasonal workers sourced by the CRS Debtors for their customers, and was responsible for the payment of temporary worker's wages and payroll, remittance of withholdings, payment of employer taxes, risk management, underwriting, and payment of workers' compensation insurance and expenses.

26.     In exchange for its PEO services, TSE was entitled under the PEO Agreement to be reimbursed by CRS for all compensation paid to temporary workers, the employer's share of taxes, workers' compensation expenses and similar costs, plus an "administrative fee" purportedly representing the cost of TSE's services and profit.  TSE billed CRS for the payroll-tax and related obligations it incurred on behalf of the CRS customers, plus its administrative fee.  CRS then typically passed those charges along to its customers, plus an additional fee for its own services.

27.     As described in paragraphs 44 to 48 below, TSE forgave or deferred the collection of tens of millions of dollars owed by CRS under the PEO Agreement, thus facilitating the CRS Debtors' competitive customer contracts and rapid expansion of their business.

**TSE Was Dominated By Tri-State**

28.     From its inception, even though it was not a Tri-State subsidiary, TSE had no real existence as a business separate from Tri-State, and was completely dominated and controlled by Tri-State.

29.     TSE never had any board meetings at which officers were appointed, and on information and belief, no shareholder or director resolutions ever were executed in lieu of meetings.  TSE did not even maintain a corporate minute book or corporate record book.  Officers and agents of Tri-State acted as *de facto* management for TSE, exerting total control over TSE's operations.  This included the Defendants, who exercised direct, complete, and virtually exclusive control over the financial reporting systems, tax and internal accounting functions of TSE.

30.     TSE had no offices independent of Tri-State, and instead "resided" in the same space occupied by Tri-State at its 160 Broadway, New York, New York offices.

31.     TSE had no employees, excluding the temporary workers provided to CRS customers.  For example, TSE had no employees of its own to carry out its core financial and accounting operations, nor did any TSE employees carry out basic PEO functions such as preparing W-2s or payroll tax returns for temporary workers.

32.     Tri-State's complete dominance over TSE extended to TSE's cash.  To enable the CRS Debtors to provide short-term financing to their customers, as well as for their own business purposes, the CRS Debtors established a receivables financing relationship with Wells Fargo Bank, N.A. ("Wells Fargo").  In connection with that financing relationship, the CRS Subsidiaries pledged their customer receivables as security to Wells Fargo, and the loans were guaranteed by CRS.

33.     As the CRS Subsidiaries' customer receivables were collected by Wells Fargo and new CRS Subsidiaries' customer receivables were created and pledged to Wells Fargo, Wells Fargo advanced funds to the CRS Subsidiaries, typically on a daily basis.  The CRS Subsidiaries in turn remitted to TSE most of the proceeds of the Wells Fargo advances pursuant to the terms of the PEO Agreement so that TSE could pay temporary worker wages, employment taxes and workers' compensation expenses associated with employees supplied by TSE to the CRS Subsidiaries' customers.

34.     Virtually each day, after the CRS Debtors made their payments to TSE, Tri-State transferred TSE funds from TSE accounts to Tri-State Group accounts, where they were commingled with Tri-State Group funds.  The Tri-State Group entities and Cassera then used the funds for a variety of purposes, many unrelated to TSE or the CRS Debtors.

35.     Tri-State ensured that TSE's basic payroll obligations to temporary and seasonal workers were met, and caused TSE's payroll accounts to be funded, thus keeping the Debtors'

businesses (and the flow of funds from the CRS Debtors to TSE to Tri-State Group) alive, at least temporarily. But as described in paragraphs 44 through 48 below, beginning in 2013 at the latest, Tri-State Group entities began failing to remit large amounts to taxing authorities on account of TSE's payroll tax-related obligations, causing them to go unpaid.

**Defendants' Relationship with TSE and Tri-State**

36.     Since at least 1995, Defendants have been providing accounting services to Tri-State Group entities and/or Cassera. After TSE was incorporated and began providing PEO services to CRS in 2011, Defendants expanded the scope of their work to provide accounting services to TSE as well. Defendants performed a wide range of accounting and related services for Tri-State and TSE, including performing many of their core financial reporting functions.

37.     Kossoff in particular was intimately involved in Tri-State's and Cassera's businesses. Kossoff and Cassera traveled together regularly by private jet from Florida to New York, where Tri-State and CRS were headquartered. They met frequently concerning Tri-State and Cassera's businesses, and Kossoff was regularly consulted about all financial matters involving Tri-State and Cassera's other businesses. Indeed, after TSE's massive unpaid tax liabilities were discovered, it was Kossoff who made presentations on behalf of Cassera to CRS's board of directors, claiming that the unpaid payroll tax liability was a "surprise" and had been "unknown."

**Defendants' Involvement in Tri-State and TSE**

38.     At all relevant times, TSE did not have a CFO or Treasurer. Nor did TSE or Tri-State have any employees with the background and experience to report the entities' multi-billion dollar cash flow. Instead, Defendants exercised direct, complete, and virtually exclusive control over the financial reporting systems, tax and internal accounting functions of TSE and

fulfilled the roles ordinarily carried out by a company's senior internal financial and accounting personnel.

39. Defendants acted with autonomy, and their conduct was their own. Their decisions facilitated TSE's massive fraud. Defendants managed TSE's financial reporting, tax and internal accounting activities and exerted unfettered influence over decisions that affected the Debtor's finances and operations.

40. Defendants controlled, maintained, and made adjustments to TSE's books and records and financial reporting systems and decided how to account for the Debtor's business activities. For example, in a submission to this Court, Kossoff explained how he caused a year-end intercompany general ledger entry to be recorded eliminating the $67 million federal payroll tax liability on TSE's books, and causing the $67 million federal payroll tax liability to be reflected on Tri-State's books. *See Declaration of Irwin Kossoff in Support of Objection to Ex Parte Application of Chapter 11 Trustee* ("Kossoff Declaration") ¶ 16 (TSE Dkt. No. 99). The Kossoff Declaration is attached as Exhibit A to the Complaint.

41. Defendants also interfaced independently and directly with TSE's auditor Lilling & Company concerning its audits of TSE's finances for years ended December 31, 2012 and December 31, 2013. Defendants were the source of the information needed for TSE's auditors to perform those audits, and information requests were directed at Defendants, not others at TSE.

42. Defendants also prepared all of the federal and state income, payroll, and other tax returns for TSE, and compiled the underlying information needed to prepare those returns.

43. In sum, Defendants were not third parties acting at the direction of management— they *were* management.

**TSE's Financial Accommodations to CRS**

44.     In order to provide the liquidity and working capital financing for CRS's third-party acquisitions and help cover the substantial overhead costs associated with CRS's public-holding-company structure, Tri-State caused TSE to forgive or defer tens of millions of dollars of CRS obligations to TSE, and to provide additional financial accommodations to CRS.

45.     By the fiscal year ended September 30, 2011, CRS's first full year of operations as a public company, CRS already had deferred payment to TSE of more than $11.4 million in obligations arising under the PEO Agreement.  The amount was converted to a "related loan payable" on TSE's books as of October 1, 2011, and continued to grow throughout 2011 and 2012.

46.     In May and July 2012, respectively, CRS and TSE entered into two agreements under which TSE accepted CRS common stock in satisfaction of $14.1 million of the related loan payable to TSE by CRS.  However, even after reducing the loan balance by $14.1 million, as of CRS's fiscal year ended September 30, 2012 the related party loan balance had again grown to $7.7 million, excluding more than $15 million that was additionally owed by CRS to TSE for wages and other employee obligations that were being paid on a current basis.  TSE did not have capital or a source of liquidity to fund deferred payment of these obligations.

47.     By CRS's fiscal year ended January 3, 2014, CRS's intercompany payable to TSE had grown to approximately $25 million ($10 million of which was classified by CRS as a current liability).  Just as TSE did not have capital or a source of liquidity to absorb the non-cash satisfaction of the CRS receivables in 2012, it did not have capital or a source of liquidity to absorb deferral of payment of this receivable from CRS in 2013.

48.     By June 2014, CRS's intercompany indebtedness to TSE had increased to more than $50 million, roughly $35 million of which was being classified by CRS as a current

liability. By September 30, 2014, that intercompany indebtedness stood at more than $55 million, roughly $40 million of which was being classified by CRS as a current liability.

**TSE and the Tri-State Group's Massive Unpaid Tax Liability**

49. TSE never had the capital or liquidity needed to make financial accommodations to CRS described in paragraphs 44 to 48 above. TSE had no credit lines or bank borrowings. The CRS Debtors were TSE's only customers and were the sole source of TSE's revenue and cash flow.

50. TSE "financed" many of its financial accommodations to CRS by failing to pay more than $100 million (exclusive of interest and penalties) in federal employment taxes for TSE employees supplied to CRS customers, as well as other obligations.

51. A pattern of significant federal tax late payments and non-payments at Tri-State (and later TSE) began at the latest in 2009. In February 2011, the IRS filed a tax lien against TS Staffing, a Cassera-owned company acquired by CRS later that year, for $830,000 in unpaid 2009 taxes. In 2012, the IRS notified TSE-PEO, Inc. that it was late on $18.9 million in taxes for the previous year; in March 2014, the IRS notified TSE that it was behind on $600,000 in taxes for 2012; and in June 2014, the IRS notified Tri-State that it had not paid $7.6 million in taxes for 2012 and $23.5 million in 2013.

52. By the end of 2013, TSE's books reflected that a massive $67 million unpaid federal payroll tax liability. Effective as of the end of 2013, Defendants recorded a year-end intercompany general ledger entry which eliminated the $67 million federal payroll tax liability from TSE's books, and caused the $67 million federal payroll tax liability to be reflected on Tri-State's books. Effective as of the end of 2013, Defendants recorded a year-end intercompany general ledger entry which eliminated the $67 million federal payroll tax liability from TSE's books, and caused the $67 million federal payroll tax liability to be reflected on Tri-State's

books.  Even if Tri-State had legitimately intended to eventually satisfy and pay TSE's payroll tax obligation, the elimination of the liability on TSE's books and financial statements was wholly improper and inaccurate inasmuch as TSE of course remained liable for its own tax obligations until they were actually paid.

53.     Defendants also masked TSE's non-payment of its critical payroll tax liabilities by causing TSE to file inaccurate tax returns.  Defendants prepared and filed on TSE's behalf Form 941 returns indicating that all of TSE's payroll taxes had been paid, when in fact they had not.

54.     Defendants also prepared and filed quarterly payroll tax returns which underreported TSE's payroll tax liability during the first, second and third quarters of each of 2012, 2013, and 2014.  As a result, TSE was able to "defer" recognition and payment of those taxes until the fourth quarter of each year, and Tri-State and Cassera would have access to significant amounts of cash in the interim.

55.     In late 2014, the 2013 year-end general ledger entry referenced in paragraph 52 above was "reversed" by Defendants, and the $67 million federal payroll tax liability "re-appeared" on TSE's financial statements.  Significant portions of TSE's 2014 federal payroll tax liability also had gone unpaid in the interim.  By the time TSE commenced its bankruptcy case on February 2, 2015, its unpaid federal payroll tax liabilities had ballooned to more than $100 million, not including penalties or interest.

56.     Not surprisingly, Tri-State Group entities also had been failing to pay their own payroll taxes.  Tri-State Group entities, for their part, had amassed an additional roughly $105 million in unpaid federal payroll tax liabilities by February 2, 2015, not including penalties or

interest.  As the Tri-State Group entities' accountants, Defendants knew that Tri-State also had failed to pay its federal payroll tax obligations.

**Intercompany Claims**

57.     As indicated in paragraphs 28 to 35 above, TSE had no employees or business independent from Tri-State, and substantially all of its business functions were performed by officers or employees of Tri-State.  Tri-State and TSE entered into an agreement pursuant to which Tri-State charged an administrative fee to TSE in exchange for the services provided by Tri-State employees.

58.     Tri-State ostensibly charged TSE an administrative fee in 2012 equal to 1.75% of TSE's gross wages (a fee of roughly $9.5 million), and an administrative fee in 2013 equal to 1.45% of TSE's gross wages (a fee of roughly $9.4 million), and caused TSE's books to reflect those fees.

59.     As of December 31, 2014, as a result of (among other things) Tri-State's misuse of TSE's cash described in paragraphs 33 and 34 above, the TSE/Tri-State general ledger intercompany account reflected that the Tri-State Group entities owed TSE approximately $90 million.

60.     On January 30 and 31, 2015, as TSE's bankruptcy case was being filed, Defendants made a series of large journal entries on TSE's general ledger in the TSE/Tri-State intercompany account, which they dated as of December 31, 2014.  Those entries had the effect of purporting to transform the large intercompany balance owed by Tri-State into a net liability to Tri-State owed by TSE.

61.     Kossoff further adjusted these entries in March 2015, subsequent to TSE's chapter 11 filing.  Kossoff has acknowledged making these adjustments.  Kossoff Decl. ¶ 12.

14

62.     The historical 2011 year-end financial statements prepared by Defendants reflected a total administrative fee owed by TSE to Tri-State of $7,278,514; the 2012 year-end financial statements prepared by Defendants reflected a total administrative fee owed by TSE to Tri-State of $9,531,223; and the 2013 year-end financial statements prepared by Defendants reflected a total administrative fee owed by TSE to Tri-State of $9,374,512.  Income tax returns prepared and filed by Defendants on behalf of TSE reflected administrative fees consistent with those financial statements.

63.     Before Defendants made the eve-of-bankruptcy journal entries, TSE's books reflected a 2014 administrative fee owed by TSE to Tri-State of $14,267,586, which would have been generally consistent with the administrative fee charged in prior years.

64.     Defendants' eve-of-bankruptcy journal entries purported to debit the TSE/Tri-State intercompany account for tens of millions of dollars in additional administrative fees.  There is no documentary support for these entries in TSE's books and records, and they exceed the percentage administrative fee Tri-State reported that it was charging TSE by tens of millions of dollars.

**Workers' Compensation Costs**

65.     Workers' compensation insurance poses particular risks for PEOs and their insurance carriers.   PEOs typically do not retroactively charge customers for workers' compensation claims as loss experiences are developed over time.  Instead, the PEO typically charges each customer up front for the anticipated cost of its workers' compensation expenses, and bears the risk that it has underestimated its long-term workers' compensation liabilities.  As the National Association of Insurance Commissioners ("NAIC") has explained, a PEO thus faces the difficult task of "analyz[ing] its development patterns, estimat[ing] its expected losses, select[ing] an appropriate safety margin and discount rate, and then allocat[ing] anticipated costs

among its clients in a manner that allows it to remain competitive in the marketplace."  NAIC, *Workers' Compensation Large Deductible Study* at 46 (2006) ("*Large Deductible Study*").[1]

66.     Failure to properly estimate and charge customers for workers' compensation costs can result in significant losses to the PEO and insolvency.  If the PEO becomes insolvent, the workers' compensation insurance carrier is left to foot the bill for unfunded fees and costs.

67.     These risks are magnified if the PEO takes out a high-deductible policy.  The NAIC further warns that "[a]n especially hazardous situation would occur if a PEO were allowed to use a small affiliated insurer to write a large deductible policy. . . .  The danger is that should the PEO become insolvent, either from its assumption of workers' compensation risk or for some other reason . . . , then its affiliated insurer would be likely to fail along with the PEO." *Large Deductible Study* at 48.

68.     Tri-State and TSE were among the largest customers of their workers' compensation insurer, Lumbermen's Underwriting Alliance ("Lumbermen's").  Lumbermen's had agreed to underwrite and administer a workers' compensation insurance program under which Tri-State and TSE (as an additional named insured) reimbursed Lumbermen's for a "deductible" of $1.25 million per occurrence for bodily injury and $1.25 million per employee for disease.  This effectively meant that TSE, the employer of record for more than 100,000 temporary workers, was self-insured for all but the largest workers' compensation claims.

69.     The high-deductible policy under which TSE essentially was self-insured meant, in the short term, that TSE initially paid lower insurance premiums to Lumbermen's and purported to pass those savings along to CRS and is customers.  However, TSE bore an ever-increasing risk of loss.  As more and more workers' compensation claims were submitted and its loss experience developed, TSE became liable to Lumbermen's for tens of millions of dollars in

---

[1] The Large Deductible Study is available at http://www.naic.org/prod_serv/WCD-OP-06.pdf.

deductibles and other obligations associated with those claims, and could not pass those losses along to CRS's customers.

70.     Lumbermen's would regularly report potential future losses related to the workers' compensation program, but despite this identified risk of loss, and notwithstanding years of workers' compensation claims in the tens of millions of dollars, Defendants never reflected a single penny of reserves for any potential or accrued workers' compensation claims on TSE's books and records.

71.     The 2011, 2012, and 2013 year-end financial statements prepared by Defendants reflected TSE workers' compensation expenses of $11,656,666, $17,823,879, and $25,091,162, respectively, for those years.

72.     Defendants made eve-of-bankruptcy journal entries on TSE's books that purported to debit the TSE/Tri-State intercompany account for tens of millions of dollars in workers' compensation-related obligations dating back to 2012.  Even though Defendants controlled and maintained TSE's books and records for TSE's entire existence, they had never previously caused these purported intercompany liabilities to Tri-State to be reflected on TSE's books, TSE's financial statements, or TSE's tax returns.

73.     Moreover, to the extent these journal entries legitimately reflected legitimate TSE workers' compensation obligations, they should have been reflected in TSE's books as a direct TSE liability to Lumbermen's, and not as an offset or charge against the TSE/Tri-State intercompany account.  Tri-State did not satisfy and pay TSE's obligations to Lumbermen's.  To the contrary, Lumbermen's was adjudicated to be insolvent and placed in liquidation after TSE's and Tri-State's obligations to Lumbermen's went unpaid, forcing Lumbermen's to book tens of

millions of dollars of losses. Thus, it would have been improper to charge the intercompany accounts for such liabilities when they remained directly due and owing to Lumbermen's.

74.    The largest eve-of-bankruptcy journal entry made by Defendants purported to debit the TSE/Tri-State intercompany account by $56,533,828 for cash and securities held in a collateral account that had been pledged to Lumbermen's. Even though Defendants controlled and maintained TSE's books and records for TSE's entire existence, they had never previously caused any such intercompany obligation to be reflected on TSE's books or financial statements.

75.    Moreover, as explained above, TSE's obligations to Lumbermen's have not been paid, and there is no accounting or other basis to treat the assets in the collateral account as having been applied in satisfaction of TSE (as opposed to Tri-State Group) obligations to Lumbermen's.

## COUNT I

### Accounting Malpractice/Negligence

76.    Plaintiff restates and re-alleges paragraphs 1 through 75 of this complaint as though fully set forth herein.

77.    An accountant has a professional obligation to exercise due care and to follow recognized and accepted professional standards in the exercise of his or her profession. For example, the Code of Professional Conduct published by the American Institute of Certified Public Accounts ("AICPA") requires accountants "to discharge professional responsibilities with competence and diligence," and "imposes the obligation to perform professional services to the best of [the accountant's] ability, with concern for the best interest of those for whom the services are performed, and consistent with the profession's responsibility to the public." § 0.300.060.02.

78.      Additionally, both Kossoff and K&K were at all relevant times licensed in New York, and were thus required to practice their profession in accordance with New York laws and regulations.  New York law prohibits "professional misconduct," defined to include practicing accounting "with gross incompetence, with gross negligence on a particular occasion or negligence or incompetence on more than one occasion."  N.Y. Educ. Law § 6509(2).  New York regulations state that, to determine whether this provision has been violated, it is appropriate to consider "the generally accepted auditing standards and accounting principles promulgated by the [AICPA] and by the Financial Accounting Standards Board."  8 N.Y.C.R.R. § 29.10(a)(12).

79.      New York regulations further prohibit "unprofessional conduct," defined to include "grossly negligent failure to comply with substantial provisions of Federal, State or local laws, rules or regulations governing the practice of the profession."  8 N.Y.C.R.R. § 29.1(a)(1).

80.      A primary responsibility of an accountant is to ensure that a company's financial statements fairly and accurately reflect the true financial condition of the company.  To that end, financial statements must be prepared and reported in accordance with the conventions, rules, and procedures recognized by the accounting profession as defining accepted accounting practices.

81.      As relevant to Defendants' preparation of TSE's financial reports, basic recognized and accepted accounting standards require that a liability should be derecognized only if the debtor is relieved of its obligation for the liability.  For example, the Financial Accounting Standards Codification ("ASC") published by the Financial Accounting Standards Board, which is the authoritative source for Generally Accepted Accounting Principles ("GAAP"), contains the following provisions:

ASC 405-20-40 (EXTINGUISHMENTS OF LIABILITIES, DERECOGNITION) – "A debtor shall derecognize a liability if and only if it has been extinguished. A liability has been extinguished if . . . a. The debtor pays the creditor and is relieved of its obligation for the liability. . . . b. The debtor is legally released from being the primary obligor under the liability, either judicially or by the creditor. . . ."

ASC 450-20-25 (RECOGNITION, GENERAL) – "An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: a. . . . [I]t is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. . . . [and] b. The amount of the loss can be reasonably estimated."

82.     Recognized and accepted accounting standards also require that tax liabilities be accurately reflected in a company's financial statements. For example, the ASC provides:

ASC 740-10-25-2 (INCOME TAXES, GENERAL RECOGNITION) – "A tax liability or asset shall be recognized . . . for the estimated taxes payable or refundable on tax returns for the current and prior years."

83.     Moreover, federal law prohibits tax return preparers from preparing a tax return containing an understatement of liability that is due to an unreasonable position or to a reckless disregard of rules or regulations. I.R.C. § 6694(a), (b). State laws also require that a company's tax returns be free of misrepresentations regarding the amount of taxes owed by the taxpayer.

84.     At all times relevant to this complaint, Defendants acted as accountants for TSE and the Tri-State Group entities. Among other things, Defendants controlled and maintained TSE's and the Tri-State Group entities' books and records. They also prepared and submitted TSE's and the Tri-State Group entities' corporate tax returns, state unemployment reports, and payroll tax returns to taxing authorities, and corresponded with federal, state and local taxing authorities regarding taxes.

85.     Kossoff expressly acknowledged Defendants' position as TSE's accountant in his declaration filed with this Court. (Kossoff Decl. ¶ 3 ("I have been the accountant for the Debtor since 2010 and the accountant for the other Tri-State companies . . . since 1995. K&K reviews and reconciles the books and records of the Debtor and the Tri-State Entities on a quarterly and

annual basis. . . . K&K prepares the Debtor's and the Tri-State Entities' corporate tax returns, state unemployment forms, the form 941s which report the payroll tax withholdings to the [IRS] and correspondence with federal, state and local taxing authorities regarding taxes.").)

86.     Kossoff acknowledged TSE's failure to pay massive payroll tax liabilities, and admitted that Defendants made the book entries "removing" these liabilities from TSE's books in 2013, then adding the liabilities back in late 2014.   (Kossoff Decl. ¶ 16.)   Defendants' "derecognition" of liabilities violated basic recognized and accepted accounting standards.

87.     In addition, Defendants prepared and filed on TSE's behalf Form 941 returns incorrectly indicating that all of its payroll taxes had been paid,  and also prepared and filed quarterly payroll tax returns which underreported TSE's payroll tax liabilities.  Defendants' failure to recognize current and prior tax liabilities violated basic recognized and accepted accounting standards, as well as federal and state laws applicable to tax return preparers.

88.     As a result of Defendants' masking of TSE's tax liabilities and their preparation and filing of incorrect tax returns, TSE was able to continue in business, transferring tens of millions of additional dollars to Tri-State Group entities and incurring tens of millions of dollars in additional liabilities that remain unpaid today.

89.     In addition, to the extent any of Defendants' eve-of-bankruptcy general ledger journal entries reflected legitimate TSE intercompany liabilities, Defendants' failure to cause these liabilities to be reflected on those liabilities, TSE books and records, financial statements, and tax returns in 2011, 2012, 2013, and 2014 violated recognized and accepted accounting standards.

90.     Moreover, to the extent any unpaid obligations to Lumbermen's are legitimately related to TSE, Defendants should have previously recorded these in TSE's books or financial

statements as a direct TSE liability to Lumbermen's, and not as an offset or charge against the TSE/Tri-State intercompany account.

91.     As TSE's accountants, Defendants owed a duty to TSE to use the skill and care ordinarily used by a reasonable and competent accountant under the same or similar circumstances.  Defendants breached their duty to provide accounting services to TSE at the required level of skill and care, as demonstrated by the gross failures and deficiencies described in this complaint.

92.     Defendants violated their duty of care owed to TSE by failing to record and reflect TSE's liabilities in accordance with recognized and accepted accounting standards and the professional standards of care.  Defendants were negligent and acted recklessly in their performance of accounting services for TSE.

93.     Defendants violated their duty of care owed to TSE by, among other things, preparing and submitting financial statements and tax returns which included incorrect information and material errors, and which did not present fairly, TSE's financial position in conformity with federal and state law and basic recognized and accepted accounting standards.

94.     Defendants failed to provide accounting services in compliance with professional standards of care and applicable law by, among other things, masking TSE's failure to pay to tens of millions of dollars in federal payroll tax obligations in 2013 and 2014 and, assuming  the Kossoff Declaration is true, by failing to properly record worker's compensation-related liabilities to Lumbermen's and TSE's intercompany liabilities to Tri-State Group entities in TSE's books and records, financial statements, and tax returns in 2011, 2012, 2013, and 2014.

95.     Defendants' negligence and/or recklessness enabled the uninterrupted flow of tens of millions of dollars from TSE to or for the benefit of the Tri-State Group and Cassera, and

permitted TSE to continue to incur tens of millions of dollars of additional liabilities long after its business should have been shut down, all to the detriment of TSE creditors.

96.     Defendants' negligence and/or recklessness have proximately caused TSE to suffer damages in an amount exceeding $100 million.

## COUNT II

### Fraud

97.     Plaintiff restates and re-alleges paragraphs 1 through 75 of this complaint as though fully set forth herein.

98.     Defendants intentionally or recklessly made numerous false representations in their capacity as TSE's accountants and tax return preparers.  These false representations included but were not limited to making book entries hiding TSE's unpaid tax liabilities in 2013. They also included making false representations in the form of the false eve-of-bankruptcy journal entries or, if the Kossoff Declaration is accurate, by failing to record liabilities in TSE's books and records during 2012, 2013, and 2014.

99.     Defendants' intentional or reckless false statements also included the preparation of numerous federal and state tax returns containing false representations concerning the timing of TSE's income and its payment of payroll-related taxes.

100.     Defendants knew that their representations were false at the time that they were made and/or made them recklessly.  As explained above, Defendant Kossoff admitted in his sworn declaration filed with this Court that he masked TSE's liabilities.  Defendants' knowledge that the representations were false when they were made is reinforced by the Defendants' eve-of-bankruptcy journal entries on TSE's books, which purported to debit the TSE/Tri-State intercompany account for tens of millions of dollars in liabilities dating back to 2012.

101.     Defendants' false representations were material, and Defendants made them knowing that TSE's financial statements and tax returns would be relied upon by TSE's creditors.

102.     TSE's creditors reasonably relied upon the accuracy of TSE's financial statement and tax returns.  Defendants' false representations induced TSE's creditors to refrain from taking actions that would have interrupted the flow of tens of millions of dollars from TSE to or for the benefit of the Tri-State Group and Cassera.  Those false representations further permitted TSE to continue to incur tens of millions of dollars of additional liabilities, long after its business would have been shut down had its true financial condition and non-payment of taxes been known.

103.     Among other things, had TSE's true financial condition been known and/or accurate tax returns been filed, state and federal taxing authorities would have taken actions to collect TSE's massive unpaid tax liabilities and prevent the incurrence of additional unpaid tax liabilities; the administrators of state workers' compensation programs would not have permitted TSE to continue operating as a PEO; and Lumbermen's would not have agreed to continue underwriting and administering TSE's workers' compensation insurance program.

104.     Defendants' false representations directly and proximately permitted TSE to incur tens of millions of dollars of additional liabilities long after its business should have been shut down, and  caused creditor losses in a corresponding amount.

105.     As a direct and proximate result of Defendants' fraud, TSE and its creditors suffered tens of millions of dollars in damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment on Counts I and II of this complaint in favor of Plaintiff, as chapter 11 trustee of TSE, and against Kossoff &

Kossoff LLP and Irwin Kossoff in an amount to be determined at trial, plus interest, costs and

attorneys' fees, and such other equitable relief as may be just and proper.


Dated: New York, New York                    Respectfully submitted,
       March 28, 2019
                                                By:  /s/ Vincent E. Lazar

                                                Vincent E. Lazar
                                                JENNER & BLOCK LLP
                                                353 North Clark Street
                                                Chicago, Illinois 60654
                                                Tel. (312) 222-9350
                                                Fax (312) 527-0484
                                                vlazar@jenner.com

                                                Richard Levin
                                                Carl Wedoff
                                                JENNER & BLOCK LLP
                                                919 Third Avenue
                                                New York, New York 10022
                                                Tel. (212) 891-1600
                                                Fax (212) 909-0815
                                                rlevin@jenner.com
                                                cwedoff@jenner.com

                                              *Attorneys for the Chapter 11 Trustee*

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X

                                                        :
In re:                                                  :        Chapter 11
                                                        :
                                                        :        Case No. 15-10243 (MG)
TS EMPLOYMENT, INC.                                     :
                                                        :
                        Debtor.                         :
                                                        :
---------------------------------------------------------- X

### DECLARATION OF IRWIN KOSSOFF IN SUPPORT OF OBJECTION
### TO *EX PARTE* APPLICATION OF CHAPTER 11 TRUSTEE

IRWIN KOSSOFF, declares under penalty of perjury:

1.      I am a partner at Kossoff & Kossoff LLP ("K&K"), a certified public accounting

firm located in Goshen New York, and I make this declaration in response to the March 26, 2015

declaration of James S. Feltman, Chapter 11 Trustee, through which declaration I understand he

sought injunctive relief against Tri-State Employment Services Inc. ("TSES"), TS Employment,

Inc. (the "Debtor") and others.  As detailed below, Mr. Feltman's declaration is erroneous in

many respects.

2.      I am a certified public accountant and formed K & K, a small accounting firm, in

1984.  Other than myself, K&K has 3 partners, 1 additional CPA, 2 junior accountants and 5

staff employees.  K&K has approximately 2600 individual tax clients and approximately 260

business clients, including of corporations, partnerships and fiduciaries, including one prior

client company with annual revenues of approximately $50-60 million (exclusive of the Debtor

and related companies).  During my early years in public accounting, I was employed at an

accounting firm, N. Tannenbaum & Co., working on tax returns and other client matters,

including the filings and financial statements for one public company, Hess Oil & Chemical

Corporation. I then worked in private industry for several years, serving as controller at several

corporations, including at a subsidiary of Revlon Inc., and as an assistant budget manager for

Revlon. I was also a member of the federal tax committee of the Westchester Society of CPAs.

      3.      I have been the accountant for the Debtor since 2010 and the accountant for the

other Tri-State companies (collectively, but exclusive of the Debtor, the "Tri-State Entities")

since 1995.[1] K&K reviews and reconciles the books and records of the Debtor and the Tri-State

Entities on a quarterly and annual basis. Among other services, K&K prepares the Debtor's and

the Tri-State Entities' corporate tax returns, state unemployment forms, the form 941s which

report the payroll tax withholdings to the Internal Revenue Service (the "IRS") and

correspondence with federal, state and local taxing authorities regarding taxes.

      4.      Each of the Tri-State Entities, except Carusso, is involved in the provision of

Professional Employer Organization ("PEO") services to clients across the country. PEO

services generally consist of payroll, benefits, worker's compensation, tax, and training services.

Each of the Tri-State Entities has been formed for an express purpose which makes it easier to

function and to manage the separate business requirements of individual states or types of

clients. For example, Tri-State North Carolina provides services to clients predominantly in

North Carolina and TSES provides PEO services to clients nationwide which are generally

companies with cash on delivery payment arrangements.

      5.      In the case of the Debtor, it provided PEO services exclusively to Corporate

Resources Services Inc. ("CRS") and its wholly owned subsidiaries. The Debtor provided

payroll services, health insurance and worker's compensation, and made tax payments for the

approximate 30,000 temporary employees of CRS. The Debtor rendered mostly weekly and

---

[1] The Tri-State Entities consist of Tri-State Employment Service Inc., and its 8 active subsidiaries: TSES, Broadway PEO, STS Group, Tri-State SC, Tri-State North Carolina, Tri-Odyssey, TSE-PEO, and Carusso Staffing ("Carusso").

some daily invoices (for daily workers) to CRS to cover these costs together with a small administrative fee which, including interest expense on past due balances, totaled 0.78% of payroll in 2014.

6.     Based upon my extensive knowledge of the books and records and tax filings of the Debtor and the Tri-State Entities, there is no basis for the Trustee's statement of the existence of a "massive fraud involving the Debtor," as alleged in ¶ 10 of his March 26, 2015 declaration (the "Feltman Declaration"). Based upon my knowledge of the books and records, the Tri-State Entities have not entered into any "suspicious or lopsided business transactions with the Debtor" (*see* Feltman Declaration at ¶ 10) and there are no missing or diverted assets as suggested by Mr. Feltman in his declaration and accompanying papers. In fact, the contrary is true. Every dollar spent and transferred by and among the Debtor and the Tri-State Entities can be accounted for. Contrary to the Trustee's sworn statements about "a massive fraud" based upon large sums of money transferred out of the Debtor, the net of all transfers, debits and credits, between the Debtor, on the one hand, and the Tri-State Entities, on the other hand, from January 2010 through January 31, 2015 results in a debt due from the Debtor to the Tri-State Entities of approximately $32 million. Therefore, the following statements of the Trustee, seemingly made without analysis or reference to any time periods, are meaningless without any detail or context: (i) the Debtor "paid Tri-State $84 million more than it received" (presumably from CRS) (*see* Feltman Declaration at ¶ 15); (ii) the Debtor "made more than $30 million in unexplained payments to a related company named 'Broadway PEO' for no discernable reason" (*see* Feltman Declaration at ¶ 15); or (iii) $1.7 billion was transferred from the Debtor to [Tri-State] (*see* Feltman Declaration at ¶ 24). Other than a vain attempt to support his baseless allegation of a "massive fraud", there appears to be no reason for the Trustee to have picked out only sums

flowing **_out_** of the Debtor when he had available to him on the same general ledger from which he obtained those transfers, all the monies flowing **_into_** the Debtor.  The Trustee also had on the general ledger all the journal entries reflecting payments made on behalf of the Debtor by the Tri-State Entities and consolidating balances to TSES quarterly and annually.  Since all transactions are recorded and reconciled in the books and records of the Debtor and there are quarterly and year-end consolidated balances, the Trustee could plainly see the net of all the transactions and determine that what he was saying presented an incomplete and misleading recitation of the actual facts.

7.     The Trustee has recently repeated his same baseless allegations in an April 15, 2015 filing, apparently without any further review of the books and records of the Debtor or inquiry to any employee or outside vendor with knowledge of the finances of the Debtor.  (*See* Trustee's Ex Parte Application, Docket No. 93, April 16, 2015.)  He now poses the question "where did that $100 million go?" (*Id.* p. 2) without the slightest recognition or acknowledgement that there may have been no $100 million in the first place, as is actually the case here.  And, in what appears to me to be an entirely unprofessional manner for someone who advised me he had an accounting background, the Trustee concludes that "the Debtor may have filled the coffers of numerous Cassera-related companies." (*Id.* ¶ 16).  In fact, I met with the Trustee at his request on April 7, 2015 together with Yolanda Trippiedi, the Debtor's Corporate Secretary, who among other things supervises the bookkeeping department of the Debtor.  This was the perfect opportunity for the Trustee to resolve any suspicions he might have harbored. He made no effort to do so.  Instead, at that meeting, the Trustee did not ask me a single question about back payroll tax liabilities, transfers from the Debtor to the Tri-State Entities, the inter-company and Debtor obligations, or any questions at all about the finances or financial

statements of the Debtor.[2]

8.     Since it appears the Trustee is not providing to the Court an accurate or balanced account of the finances of the Debtor, I believe it is time to set the record straight directly with the Court.

9.     The Debtor and the Tri-State Entities were cash strapped.  In the ordinary course of business, every day funds were disbursed between the Debtor and the Tri-State Entities, wherever cash was required to fund operations.  The inter-company and Debtor transfers were accurately recorded in the books and records of each company, which books and records were kept separately, and then reconciled quarterly and annually.  As can be seen by a review of the books and records from 2010 forward, the Debtor owed monies to TSES for worker's compensation and medical insurance for the CRS employees.  The Debtor also sometimes had cash available that was used by one of the Tri-State Entities for its own operations when not immediately needed by the Debtor.  But, most often, the Debtor needed funds to pay payroll taxes, worker's compensation or other expenses, and the Tri-State Entities funded those costs. The net of all those transactions as at January 31, 2015 is the approximate $32 million net due from the Debtor to the Tri-State Entities.

10.     On the day the Feltman Declaration was filed (and prior to its filing), the Debtor provided to the Trustee, at his request, the Debtor's January 2015 financial statements which reflected the $32 million debt due from the Debtor to the Tri-State Entities (including $28 million due to TSES).  *See* Exhibit A attached financial statements/balance sheet, including long-term liabilities reflecting all inter-company obligations broken out by company on the Debtor's balance sheet at January 31, 2015 and accompanying email transmittal on March 26, 2015.

---

[2] The only subject matter raised by the Trustee at the meeting was about whether the payroll invoices rendered to CRS were accurate, which they were, as Ms. Trippiedi demonstrated to him by obtaining sample invoices and payroll runs for randomly selected dates and comparing the two.

11.    In addition to his selected cash figures going out of the Debtor, the Trustee also references as another one of his cited "questionable related-entity transactions" approximately $20 million in overhead allocations to the Debtor from the Tri-State Entities in 2012 and 2013. (*See* Feltman Declaration at ¶ 15.) As the Trustee himself has noted, the Debtor has no direct employees. The facilities and manpower to operate the Debtor are provided through Tri-State. All administrative expenses are shared by the Tri-State Entities and the Debtor, pro rated on the basis of each entity's total dollar amount of client payroll. As the Debtor's client payroll increased over the years after 2010, its pro rata share of the administrative expenses dropped from 1.8% of payroll in 2011 to 0.78% of payroll in 2014. For example, in 2013, total administrative costs for the Tri-State Entities' and the Debtor's operations was approximately $21 million. This sum consisted of approximately $12 million in manpower costs and approximately $8.5 million in overhead costs, such as rent, utilities and supplies. Although the Debtor's client payroll was over 50% of total payroll, the Debtor paid less than 50% of administrative costs, approximately $9 million. For a company with approximately $760 million in gross revenues in 2013, overhead costs of approximately $9 million does not suggest any impropriety and there was none. *See* Exhibit B, Schedule of Administrative Costs and Allocations.

12.    In addition to picking out numbers in isolation to deem "suspicious", the Trustee appears to have made no effort to understand how the payroll tax deficit arose before erroneously alleging it involved a "massive fraud". A simple review of the books of the Debtor make very clear what transpired here as all transactions are recorded in those books. Those books have been available to the Trustee at the Debtor's offices from the time of his appointment. Beginning in 2011, a cash deficit arose between the Debtor and CRS on account of CRS's

unpaid invoices. By the end of January 2015, that cash deficit was approximately $63 million.[3] Those are funds that the Debtor did not have available to it to make timely payroll tax payments.

13.  In addition to this approximate $63 million shortfall in payments on invoices rendered by the Debtor to CRS, a further cash shortfall was created because the Debtor underestimated the costs of worker's compensation for the approximate 30,000 CRS employees. The Debtor had agreed to charge CRS a fixed fee on that basis which turned out to be substantially less than the Debtor was obligated to pay in actual costs for worker's compensation. In addition, the Debtor was obligated to pay collateral for the worker's compensation claims, which collateral was not charged to CRS at all. The shortfall between amounts charged to CRS and amounts for which the Debtor was obligated in worker's compensation costs and collateral totaled approximately $48.5 million and $56 million, respectively, between January 2012 and December 31, 2014. Thus, there was a total cash shortfall relating to the provision of worker's compensation of $104.5 million during that period.

14.  As background, TSES held the worker's compensation insurance policy issued by Lumbermen's Underwriting Alliance ("Lumbermen's") which included coverage for CRS's 30,000 temporary employees serviced by the Debtor. Therefore, the Debtor owed to TSES the funds necessary to pay the premium and claims on behalf of the CRS employees, as well as collateral required to be maintained by Lumbermen's to cover the claims of those employees.[4] While the Debtor charged CRS a flat fee for worker's compensation based upon its estimate of cost, the Lumbermen's policy was not based on a flat fee. The policy provided for a payment of a percentage of standard insurance premium which was approximately 25% in 2014, plus 100%

---

[3] In 2012, there was an offset of approximately $14.1 million when the Debtor accepted stock in lieu of cash payment of invoices totaling approximately $14.1 million.

[4] I understand that a description of the policy and how it operated is contained in Lumbermen's March 2, 2015 filing. (Docket Nos. 39-40.)

of the states' taxes required to be paid by Lumbermen's on the gross premium which averaged another approximate 20% of standard policy premium. In addition, the Debtor was obligated to pay up to a maximum for each individual claim, which maximum was $1.25 million in the 2014 policy, and a required amount of collateral to be held as security for the claims which was 100% of current claims and a percentage of claims for development (*i.e.*, anticipated future increases in costs to current claims). Between January 2012 and December 31, 2014, CRS was charged $84 million for worker's compensation but the costs of and collateral for worker's compensation for CRS's temporary employees totaled approximately $188.5 million, leaving a cash shortfall of approximately $104.5 million. Thus, the Debtor had a large cash shortfall relating to the provision of worker's compensation, caused by its underestimation of what turned out to be the outsized costs of claims, as well as its obligation for large sums of required collateral. The Debtor's agreement with CRS with respect to CRS's payments for worker's compensation was insufficient to cover the actual obligations of the Debtor for worker's compensation, creating a further cash shortfall of the Debtor of $104.5 million.

15.    In total, the approximately $63 million shortfall in payments from CRS to the Debtor on account of unpaid invoices and the approximate $104.5 million shortfall created by the delta between $84 million in the worker's compensation costs charged to CRS and the sums for which the Debtor was obligated for CRS's worker's compensation, which together total $167.5 million, is the cause of the Debtor's inability to make all payroll tax payments on a timely basis. In short, business stresses, not a "massive fraud", account for the delay by the Debtor in being able to fund some of its payroll tax payments.

16.    The Trustee asserts, as his final alleged indication of a "massive fraud involving the Debtor", that the Debtor's tax obligations of as much as $100 million was "grossly

inconsistent with the Debtor's filed tax returns." (Feltman Declaration at ¶ 5). In his accompanying *ex parte* application, the Trustee specifies that he is referring to the difference between a payroll tax liability of $26 million allegedly reported in the Debtor's 2013 federal tax return and the February 2015 bankruptcy filing where it was reported to the Court that the Debtor's payroll tax liability while not finally calculated "could be as high as $100 million." (Ex Parte Application, March 26, 2015, Docket No. 60, p. 3.) In the first instance, it should be noted that **from 2010 when the Debtor began in business, it has paid approximately $391 million in federal payroll taxes, including approximately $133 million in 2014 alone.** Turning to the specific allegation of the Trustee, there was actually no $26 million in payroll tax liabilities reported in the Debtor's 2013 federal tax return. The payroll tax liabilities of the Debtor, which were $67 million for the year end 2013, had been transferred to the books of TSES, reported on TSES's 2013 tax returns, and then, in late 2014, those 2013 tax liabilities were transferred back to the Debtor. *See* Exhibit C, consisting of relevant pages from the 2013 tax returns of the Debtor and Tri-State.

17. The above tax liability transfers occurred for the following reasons. On May 21, 2013, the Debtor had transferred to TSES 30,472,676 shares of CRS stock. The stock transfer was made to reduce the Debtor's shareholdings in CRS so that the Debtor would not have to report equity earnings on investment in CRS, as required by the American Institute of Certified Public Accountants ("AICPA"), which the Debtor had to do in 2012 in the approximate amount of $185,000. For the transaction, an independent valuation prepared in March 2012 was used which valued the stock at .4622 per share (when it was trading at .55 a share) and a promissory note in the amount of $14,084,410.84 was issued by TSES to the debtor.[5] However, on the day

---

[5] This stock had previously been given to the Debtor by CRS in March and July of 2012 in reduction of approximately $14.1 million of the outstanding debit for unpaid invoices owed by CRS to the Debtor.

of the stock transfer in May 2013, CRS stock was trading at $1.65 per share so the value of the

stock was substantially higher, closer to $50 million. By mid-November 2013, CRS stock was

trading at $3.87 a share, making the more than 30 million shares transferred to TSES worth

approximately $117,929,256. TSES intended to borrow against and/or to sell shares in 2014 and

use the proceeds to pay all the Debtor's outstanding back payroll taxes. However, in 2014, CRS,

which had retained a new accounting firm, Crowe Horwath, did not complete the CRS 2013

financial statements in time for CRS's usual filing in April 2014, and the financial statements

were not completed and issued until September 2014. Meanwhile, the price of CRS stock

declined to an average price of approximately $1.50 in September 2014. As a result, TSES did

not sell the CRS stock and repay the Debtor's back payroll tax liabilities of $67 million, so that

liability was transferred back to the Debtor's books and records in late 2014.[6] In addition to

those outstanding payroll taxes, the Debtor, while paying $133 million in payroll taxes in 2014,

had additional unpaid payroll tax liabilities of approximately $27 million at year end 2014 and

another approximate $6 million in January 2015 prior to the bankruptcy filing, which I am

informed occurred when Wells Fargo, CRS's lender, failed to provide available funds for that

purpose. Accordingly, at the time of the bankruptcy, the Debtor's outstanding liabilities for back

payroll taxes was approximately $100 million, as the Court was informed upon the bankruptcy

filing. At that same time, the Debtor also owed to Tri-State a net of approximately $32 million.

In addition, the Debtor had other outstanding debts of approximately $ 36.5 million, including

approximately $9 million in overdrawn cash accounts and approximately $27 million in accounts

payable. *See* Exhibit D, Financial Statement Balance Sheet at January 31, 2015 columns D and

E. Together, the outstanding obligations of the Debtor total the approximate $167.5 million cash

---

[6] The reporting of the $67 million liability for back payroll taxes on the TSES 2013 tax return had no impact on TSES's revenues or expenses or its tax calculations.

shortfall suffered by the Debtor since 2012. In short, there is no missing or diverted $100 million or any missing or diverted monies at all.

18.     In January 2015, shortly before the bankruptcy filing, I attended a meeting, together with counsel for the Debtor, with Ms. Catherine Rodriguez, the IRS revenue agent assigned to collection of the Debtor's payroll taxes. At that meeting, we discussed developing a repayment plan for the back 2013 and 2014 payroll taxes. We explained to Ms. Rodriguez the steps that would be taken both by the Debtor and by CRS which would make it possible to pay the back payroll taxes. For 2015, the Debtor had increased its gross margin to CRS by 5% and CRS was going to: 1) increase prices to its clients; 2) reduce overhead and 3) exit clients with bad worker's compensation insurance experiences to reduce the cost of worker's compensation.[7] Ms. Rodriguez was receptive to developing a payment plan and she recognized that the Debtor had previously paid all back payroll taxes when the Debtor previously fell behind in 2012. If Wells Fargo had not intervened and determined to shut down CRS, I believe a successful plan would have been developed, the back payroll taxes would have been paid for 2013 and 2014, and both CRS and the Debtor would have continued in business.

19.     In sum, there has been no "fraud" committed here. There were business stresses at CRS which caused it to fall short on its obligations to pay the Debtor sums due, the worker's compensation costs owed by the Debtor were much higher than had been projected and were charged on too low a flat fee basis to CRS, and the costs of collateral for worker's compensation were not charged to CRS at all. Together these factors led the Debtor to have cash shortages and be unable to meet the payroll tax obligations in a timely fashion. Nonetheless, as set forth above,

---

[7] Throughout 2014, some of the business issues which were hindering profitability of the Debtor were being analyzed and addressed. In addition to gathering information concerning the Debtor's undercharging CRS for worker's compensation, the Debtor identified the CRS clients with the worst worker's compensation claims experience and also sent staff to certain CRS clients to provide safety and other training in order to reduce worker's compensation claims.

the Debtor paid approximately $391 in payroll taxes during its first 5 years in business and I believe would have been able to correct the errors which caused the shortfall and thus would have been able to pay the back taxes and current tax obligations.  All transactions are reflected on the books and records of the Debtor from which the facts set forth in this declaration can easily be confirmed.

20.    Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2015 in Boynton Beach, Florida

IRWIN KOSSOFF

# EXHIBIT A

## Wellin, Andrew S.

| | |
|---|---|
| **From:** | Yolanda Trippiedi <ytrippiedi@tristateemployment.com> |
| **Sent:** | Thursday, April 09, 2015 9:30 AM |
| **To:** | Wellin, Andrew S. |
| **Cc:** | 'ernie kossoff' |
| **Subject:** | FW: TS EMPLOYMENT INC 2014-2015 Financial Statement: <Standard> Balance Sheet |
| **Attachments:** | _Standard_ Balance Sheet.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Flagged |

Andrew

See attach


Thank you,

Yolanda Trippiedi

Tri State Employment Services, Inc.
160 Broadway 15th Floor
New York, New York 10038
Tel# 212-346-7960
Cell# 917-921-1338
Fax# 212-202-6178


-----Original Message-----
From: Yolanda Trippiedi [mailto:ytrippiedi@tristateemployment.com]
Sent: Thursday, March 26, 2015 4:24 PM
To: 'rcrisafulli@mesirowfinancial.com'; 'Lyman, Scott'
Cc: 'ernie kossoff'; 'nkuris@tristateemployment.com'
Subject: FW: TS EMPLOYMENT INC 2014-2015 Financial Statement: <Standard> Balance Sheet

Rob

See attach Balance Sheet Jan 2015


Thank you,

Yolanda Trippiedi

Tri State Employment Services, Inc.
160 Broadway 15th Floor
New York, New York 10038
Tel# 212-346-7960
Cell# 917-921-1338

Fax# 212-202-6178

-----Original Message-----
From: NIna Kuris [mailto:nkuris@tristateemployment.com]
Sent: Thursday, March 26, 2015 4:23 PM
To: Yolanda Trippiedi
Subject: FW: TS EMPLOYMENT INC 2014-2015 Financial Statement: <Standard> Balance Sheet

Nina Kuris
Tri-State Employment Services Inc.
Controller
PH: 212-346-7960 ext. 388
Fax: 212-346-9528

This message and any attachments are intended only for the use of the
addressee and may contain information that is Privileged and confidential.
if the reader of the message is not the intended recipient or an authorized
representative of the intended recipient, you are hereby notified that any
dissemination of this communication is strictly prohibited. If you have
received this communication in error, notify the sender immediately by
return email and delete the message and any attachments from your system.

-----Original Message-----
From: NIna Kuris [mailto:nkuris@tristateemployment.com]
Sent: Thursday, March 26, 2015 4:09 PM
To: erniekossoff@bellsouth.net
Subject: TS EMPLOYMENT INC 2014-2015 Financial Statement: <Standard> Balance
Sheet

This financial statement, <Standard> Balance Sheet, was generated on
03/26/2015 for TS EMPLOYMENT INC 2014-2015.

In order to open this file, AdobeR ReaderR must be installed on your
computer. To get a free version of this software from Adobe, go to
www.adobe.com/support/downloads/main.html

TS EMPLOYMENT INC 2014-2015
Balance Sheet
January 31, 2015

## ASSETS

Current Assets

| | | |
|---|---|---|
| Chase_934129677 EXP | $ | (583,928.85) |
| Chase-934-129669 P/R IOS | | (239,007.40) |
| WF 412 2124662 P/R AA | | (638,819.59) |
| WF 4128875358 SM | | (24,445.20) |
| WF 412 2124670 P/R DIAMOND | | (1,473,443.97) |
| SOVEREIGN 729 04950739 PR DIA | | (858,254.91) |
| SOVEREIGN 10027947240 | | (2,109,621.05) |
| WF 412 4001686 TS STAFFING | | (3,610,879.70) |
| WF 412 5513002 IOS | | (467,618.90) |
| CITI 998 7259395 PR CRD | | 91,983.76 |
| Account Receivable-IOS | | 5,503,189.27 |
| Account Receivable-TS STAFF SE | | 32,305,629.69 |
| AR-ACCOUNABILITIES | | 7,183,825.10 |
| AR-CRD | | 5,515,563.65 |
| AR-CRS | | (2,165,436.24) |
| AR-CRS-TRITEL | | 43,966.29 |
| AR-DIAMOND | | 9,854,899.32 |
| AR-ICG | | 5,144,709.67 |
| AR-NATIONWIDE SCREENING | | 41,414.06 |
| NYS SUTA Ref Recvble CRD | | 868,592.24 |
| | | |
| Total Current Assets | | 54,382,317.24 |
| | | |
| Property and Equipment | | |
| | | |
| Total Property and Equipment | | 0.00 |
| | | |
| Other Assets | | |
| Prepaid Expenses | | 2,699.09 |
| Suta Deposit-NH | | 11,000.00 |
| Deferred Tax Asset | | 42,369.00 |
| Workers Comp Collateral Deposi | | 56,533,828.00 |
| | | |
| Total Other Assets | | 56,589,896.09 |
| | | |
| Total Assets | $ | 110,972,213.33 |

## LIABILITIES AND CAPITAL

Current Liabilities

| | | |
|---|---|---|
| Accounts Payable | $ | 5,396,355.38 |
| Accounts Payable-OVERLOAD | | (555,420.64) |
| ACCRUED PAYROLL | | 10,764,393.90 |
| Accrued Payroll Taxes | | 3,305,874.52 |
| Accrued Expenses | | 212,666.06 |
| Corporation Taxes | | 29,053.00 |
| Federal & Fica Taxes Payable | | 67,424,697.33 |
| Federal & Fica Taxes Payable | | 26,828,391.83 |
| Federal & Fica Taxes Payable | | 5,975,648.94 |
| EFLEX FOR ALL | | 41,637.88 |
| Deductions-401K | | 15,602.56 |
| Deductions Payable | | 571,987.78 |
| Deduct Payable_Accountabilites | | 40,459.70 |
| Deduct Payable_CRD | | 838.27 |
| Deduct Payable_CRS | | 41.69 |

Unaudited - For Management Purposes Only

TS EMPLOYMENT INC 2014-2015
Balance Sheet
January 31, 2015

| | |
|---|---:|
| Deduct Payable_Diamond | 23,320.96 |
| Deduct Payable_ICG | 35.00 |
| Deductions Payable_IOS | 753.83 |
| Deduct Payable_STAFF | 17,380.01 |
| Child Support Deductions | 141,902.91 |
| C/S Ded_CRD | 30.81 |
| Withholding Tax | 318,303.35 |
| NY Withholding Tax | 324,674.16 |
| NY Withholding Tax | 143,318.38 |
| NY LOCAL W/H | 1.02 |
| NY MTA Withholding Tax | 2,773.16 |
| NY SDI ER tax | 13,152.95 |
| NJ Withholding Tax | 323,772.25 |
| NJ LOCAL Withholding Tax | 3,919.34 |
| CA  Withholding Tax | 197,568.63 |
| PA  Withholding Tax | 30,121.85 |
| PA  LOCAL Withholding Tax | 11,617.44 |
| PA  OCCUPATION Withholding Tax | 1,041.10 |
| PA  SCHOOL Withholding Tax | 580.01 |
| VA  Withholding Tax | (2,398.16) |
| DE Withholding Tax | 1,828.26 |
| KS W/H TAX | 235.45 |
| MA witholding tax | 268,630.93 |
| OH W/H TAX | 1,298.57 |
| ND Withholding Tax | 12.56 |
| MN Withholding Tax | (208.61) |
| IA WITHHOLD TAX | 809.18 |
| MO Withholding Tax | (290.38) |
| MO LOCAL TAX | 288.43 |
| AZ Withholding Tax | 8,623.09 |
| NV Withholding Tax | 278.00 |
| UT Withholding Tax | 10,885.36 |
| WISC W/H TAX | 461.51 |
| ME Withholding Tax | 2,403.78 |
| D.C. Withholding Tax | 1,082.47 |
| CO W/H TAX | 4,121.87 |
| CO OCCUPATION TAX | 64.50 |
| CT  Withholding Tax | 211.35 |
| MI W/H TAX | 5,386.76 |
| OK Witholding Tax | 2,979.12 |
| IL WITHHOLD TAX | (12,823.24) |
| MD WITHHOLDING TAX | 17,778.03 |
| MD LOCAL WITHHOLDING | 275.90 |
| NC Withholding Tax | 10,599.21 |
| MS W/H TAX | 12.00 |
| OR Withholding Tax | 1,708.42 |
| OR COUNTY Withholding Tax | 1,880.16 |
| SC Withoulding tax | 29,040.47 |
| WV withholding tax | 3,228.42 |
| NE W/H TAX BAL OK | 495.90 |
| KY W/H TAX | 9,175.03 |
| AL W/H TAX | 674.37 |
| AL local  W/H TAX | 26.54 |
| GA Withholding Tax | 27,787.18 |
| AR Withholding Tax | 3,880.54 |
| RI Withholding Tax | 10,303.11 |
| LA W/H TAX | 1,109.00 |
| NM W/H TAX | 209.19 |
| IN W/H TAX | 9,460.43 |
| IN LOC TAX | 235.87 |

Unaudited - For Management Purposes Only

TS EMPLOYMENT INC 2014-2015
Balance Sheet
January 31, 2015

| | |
|---|---:|
| CA SDI payable | 15.50 |
| UT SDI PAYABLE | 52.86 |
| NJ SDI payable | 769,222.49 |
| TN SDI PAYABLE | 18.06 |
| PA_SDI PAYABLE | 18.99 |
| Suspense Acct Payable??? | 19,586.94 |
| FUTA Tax Payable | 73,567.47 |
| FUTA Tax Payable | (5,438,066.67) |
| FUTA Tax Payable | (256,644.36) |
| FUTA Payable_IOS | 79.22 |
| FUTA Payable_TS STAFFING | 3,265,014.15 |
| FUTA Payable_ACCOUNTABILITES | 658,955.63 |
| FUTA Payable_CRD | 393,632.77 |
| FUTA Payable_CRS | 225.39 |
| FUTA Payable_CRS/TRITEL | (169.19) |
| FUTA Payable_DIAMOND | 2,077,982.60 |
| FUTA Payable_ICG | 53,262.29 |
| Sales Tax Payable | (3,876.80) |
| DE ETT | 258.63 |
| AZ Special Assessment tax | 360.17 |
| NV Business Tax Payable | 53,902.85 |
| NH Business Tax Payable | 24,398.58 |
| SUTA Tax Payable | 598,822.94 |
| NY SUTA Tax Payable | 203,888.14 |
| NJ SUTA Tax Payable | 147,929.72 |
| CA SUTA Tax Payable | 1,771,563.62 |
| PA SUTA Tax Payable | 10,343.47 |
| VA SUTA Tax Payable | (1,441.95) |
| DE SUTA Tax Payable | 1,110.92 |
| KS SUTA Tax Payable | 376.52 |
| MA SUTA Tax Payable | 518,181.06 |
| OH SUTA Tax Payable | 13,160.92 |
| TN SUTA Tax Payable | 17,251.27 |
| MN SUTA Tax Payable | (1,114.34) |
| IA SUTA Tax Payable | 854.22 |
| MO SUTA Tax Payable | (1,677.30) |
| AZ SUTA Tax Payable | (7,711.28) |
| NV SUTA Tax Payable | (12,791.43) |
| UT SUTA Tax Payable | 12,868.80 |
| WI SUTA Tax Payable | 1,636.22 |
| SD SUTA Tax Payable | (19.85) |
| ME SUTA Tax Payable | (5,400.19) |
| DC SUTA Tax Payable | 3,722.04 |
| CO SUTA Tax Payable | (7,654.09) |
| CT SUTA Tax Payable | 13,986.78 |
| MI SUTA Tax Payable | 16,753.95 |
| OK SUTA Tax Payable | 6,740.63 |
| IL SUTA Tax Payable | 145,050.46 |
| MD SUTA Tax Payable | 22,888.98 |
| NC SUTA Tax Payable | 27,190.72 |
| MS SUTA Tax Payable | 228.30 |
| OR SUTA Tax Payable | 3,764.05 |
| SC SUTA Tax Payable | 25,857.80 |
| WV SUTA PAYABLE | 1,557.08 |
| NE SUTA Tax Payable | 2,153.92 |
| WA SUTA Tax Payable | 5,556.43 |
| KY SUTA Tax Payable | 14,706.51 |
| AL SUTA Tax Payable | 1,415.34 |
| GA SUTA Tax Payable | 33,032.51 |
| AR SUTA PAYABLE | 1,747.71 |

Unaudited - For Management Purposes Only

TS EMPLOYMENT INC 2014-2015
Balance Sheet
January 31, 2015

| | | |
|---|---:|---:|
| RI SUTA Tax Payable | 26,202.07 | |
| LA SUTA Tax Payable | 1,462.91 | |
| NM SUTA Tax Payable | 424.30 | |
| ID SUTA Tax Payable | 0.22 | |
| IN SUTA Tax Payable | (20,331.58) | |
| SD SUTA Tax Payable | 17.58 | |
| NH SUTA Tax Payable | 3,325.60 | |
| FL SUTA Tax Payable | 57,012.52 | |
| TX SUTA Tax Payable | 36,876.67 | |
| ND SUTA Payable | 57.87 | |
| Other Current Liabilities | 2.43 | |
| | | |
| Total Current Liabilities | | 127,411,634.69 |
| | | |
| Long-Term Liabilities | | |
| DUE To/From ServiceS | 28,489,698.92 | |
| Due to/from STS GROUP | (271.49) | |
| Due/To From E | (3,363,818.86) | |
| Due/To From BROADWAY PEO | (1,970,711.04) | |
| Due/To From TS HEALTH | 9,281,400.00 | |
| Due/To From DC RESTAURANTS | 11,700.00 | |
| | | |
| Total Long-Term Liabilities | | 32,447,997.53 |
| | | |
| Total Liabilities | | 159,859,632.22 |
| | | |
| Capital | | |
| Additional Paid In Capital | 98,000.00 | |
| Capital Stock | 2,000.00 | |
| Retained Earnings | (49,522,650.10) | |
| Net Income | 535,231.21 | |
| | | |
| Total Capital | | (48,887,418.89) |
| | | |
| Total Liabilities & Capital | $ | 110,972,213.33 |

EXHIBIT B

| | Gross Wages | % Allocable | $ Allocable |
|---|---|---|---|
| Tri-State S | 142,614,659 | 2.000% | 2,852,293 |
| STS Group | 28,512,680 | 1.000% | 285,127 |
| Broadway | 21,160,612 | 2.000% | 423,212 |
| TSE-PEO | 221,445,778 | 2.750% | 6,089,759 |
| Tri-Odyssey | 19,299,936 | 2.750% | 530,748 |
| Tri-State E | 77,266,387 | 2.000% | 1,545,328 |
| TS Employment | 646,518,055 | 1.450% | 9,374,512 |
| Tri-State NC | 1,761,837 | 2.000% | 35,237 |
| Tri-State SC | 3,061,112 | 2.000% | 61,222 |
| | | | |
| Total | 1,161,641,056 | | 21,197,438 |

| | | |
|---|---|---|
| Carusso | 12,637,854 | (less sts allocation) |
| Overhead | 8,500,000 | |
| | | |
| Total Costs | 21,137,854 | |
| | | |
| As a % of Wages | 1.820% | |



SENT TO AUDITOR:

TS EMPLOYMENT
MANAGEMENT FEE
12/31/2013

GROSS WAGES                      646,518,055

PERCENT ALLOCATION                      1.450%

TOTAL                      9,374,512



**Expenses**

| | |
|---|---:|
| Advertising Exp - NY Tri-State | 34,524.20 |
| Bank Charges -Visa Credit Card | 1,027.82 |
| Bank Charges - NY | 1,534,063.42 |
| Workers Comp Claim Adjusters | 244,833.00 |
| Workers Comp Broker Fee | 208,154.00 |
| Background | 15,213.30 |
| Auto Expense - NY | 47,324.14 |
| Training Exp. | 7,550.76 |
| Computer Exp. - NY | 45,007.95 |
| FEDEX | 269,921.00 |
| Dues & Subscriptions - NY | 11,789.56 |
| Drug  Screenings | 8,693.30 |
| Reference Expense | 64,844.17 |
| Rent-NJ | 27,580.00 |
| Rent - NY | 673,232.59 |
| Rent - FLA | 36,739.85 |
| Rent - CA | 18,200.00 |
| Gifts | 1,400.00 |
| Insurance-General Liability | 53,405.68 |
| Insurance - Life | 12,894.20 |
| Interest Expense-NY | 1,964,439.52 |
| Accounting | 944,600.00 |
| Legal | 540,612.22 |
| Licenses & Fees | 18,325.56 |
| Meals & Entertainment | 83,183.46 |
| Travel | 406,066.90 |
| Miscellaneous Exp.-NY | 35,488.61 |
| Office Maintance | 179,359.45 |
| Office Maintenance - NY | 1,778.51 |
| Messenger Service | 8,783.11 |
| Training-NY | 6,864.00 |
| Printing | 546.19 |
| Printing-NY | 45,710.16 |
| Office Supplies & Expenses | 200,130.13 |
| Office Supplies & Exp.- NY | 57,685.31 |
| Postage & Deliveries - NY | 127,226.98 |
| Repairs & Maintenance - NY | 19,928.12 |
| Cable | 5,538.49 |
| Telephone - NY Tri-State | 227,532.44 |
| Telephone - FLA | 11,944.63 |
| Telephone - CA | 4,350.86 |
| Utilities - NY | 135,975.07 |
| Utilities - NY - 10FL | 2,987.55 |
| Utilities - FLA | 4,135.14 |
| Safet Jenashevia | 47,589.00 |
| John Cutolo | <u>171,600.00</u> |
| | <u>8,568,780.35</u> |

EXHIBIT C

TRISCSH2A 04/21/2015 3:32 PM

| Form **1120** | | **U.S. Corporation Income Tax Return** | | OMB No 1545-0123 |
|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | For calendar year 2013 or tax year beginning _____ , ending _____ ▶ Information about Form 1120 and its separate instructions is at www.irs.gov/form1120. | | **2013** |

**A Check if:**
1a Consolidated return (attach Form 851) ☐
b Life/nonlife consolidated return ☐
2 Personal holding co. (attach Sch. PH) ☐
3 Personal service corp. (see instructions) ☐
4 Schedule M-3 attached ☒

TYPE OR PRINT

**Name**
TRI-STATE EMPLOYMENT SERVICES, INC.

**Number, street, and room or suite no. If a P.O. box, see instructions**
160 BROADWAY 15TH FLOOR

**City or town, state, or province, country and ZIP or foreign postal code**
NEW YORK          NY 10038

**B Employer identification number**
3600

**C Date incorporated**
05/01/2002

**D Total assets (see instructions)**
$ 128,609,457

**E Check if: (1)** Initial return **(2)** ☐ **(3)** Final return ☐ **(4)** Name change ☐ Address change ☐

| | | | | | |
|---|---|---|---|---|---|
| **Income** | 1a | Gross receipts or sales | 1a | 168,126,181 | |
| | b | Returns and allowances | 1b | | |
| | c | Balance. Subtract line 1b from line 1a | | 1c | 168,126,181 |
| | 2 | Cost of goods sold (attach Form 1125-A) | | 2 | 173,611,052 |
| | 3 | Gross profit. Subtract line 2 from line 1c | | 3 | -5,484,871 |
| | 4 | Dividends (Schedule C, line 19) | | 4 | |
| | 5 | Interest | | 5 | 579,540 |
| | 6 | Gross rents | | 6 | |
| | 7 | Gross royalties | | 7 | |
| | 8 | Capital gain net income (attach Schedule D (Form 1120)) | | 8 | |
| | 9 | Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | 9 | |
| | 10 | Other income (see instructions—attach statement) See Stmt 1 | | 10 | 13,679,723 |
| | 11 | **Total income. Add lines 3 through 10** ▶ | | 11 | 8,774,392 |
| **Deductions (See instructions for limitations on deductions.)** | 12 | Compensation of officers (see instructions—attach Form 1125-E) | | 12 | |
| | 13 | Salaries and wages (less employment credits) | | 13 | |
| | 14 | Repairs and maintenance | | 14 | 201,066 |
| | 15 | Bad debts | | 15 | |
| | 16 | Rents | | 16 | 755,752 |
| | 17 | Taxes and licenses | | 17 | 296,397 |
| | 18 | Interest | | 18 | 1,964,440 |
| | 19 | Charitable contributions | | 19 | |
| | 20 | Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | 20 | |
| | 21 | Depletion | | 21 | |
| | 22 | Advertising | | 22 | 34,524 |
| | 23 | Pension, profit-sharing, etc., plans | | 23 | |
| | 24 | Employee benefit programs | | 24 | |
| | 25 | Domestic production activities deduction (attach Form 8903) | | 25 | |
| | 26 | Other deductions (attach statement) See Stmt 2 | | 26 | 40,729,726 |
| | 27 | **Total deductions. Add lines 12 through 26** ▶ | | 27 | 43,981,905 |
| | 28 | Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | | 28 | -35,207,513 |
| | 29a | Net operating loss deduction (see instructions) | 29a | | |
| | b | Special deductions (Schedule C, line 20) | 29b | | |
| | c | Add lines 29a and 29b | | 29c | |
| **Tax, Refundable Credits, and Payments** | 30 | Taxable income. Subtract line 29c from line 28 (see instructions) | | 30 | -35,207,513 |
| | 31 | Total tax (Schedule J, Part I, line 11) | | 31 | 0 |
| | 32 | Total payments and refundable credits (Schedule J, Part II, line 21) | | 32 | |
| | 33 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | | 33 | |
| | 34 | Amount owed. If line 32 is smaller than the total of lines 31 and 33, enter amount owed | | 34 | |
| | 35 | Overpayment. If line 32 is larger than the total of lines 31 and 33, enter amount overpaid | | 35 | |
| | 36 | Enter amount from line 35 you want: Credited to 2014 estimated tax ▶ _____ Refunded ▶ | | 36 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer ROBERT CASSERA        Date _____        Title PRESIDENT

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| IRWIN KOSSOFF | IRWIN KOSSOFF | 04/21/15 | | P00750650 |

Firm's name ▶ Kossoff & Kossoff, CPAs, LLP        Firm's EIN ▶ 8450

Firm's address ▶ 3 Hatfield Ln
Goshen, NY        10924        Phone no. 845-294-1040

For Paperwork Reduction Act Notice, see separate instructions.
DAA

Form **1120** (2013)

TRISCSH2A 04/21/2015 3:32 PM

| Form 1120 (2013) | TRI-STATE EMPLOYMENT SERVICES, INC. | 3600 | | Page 5 |

### Schedule L — Balance Sheets per Books

| | Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|---|
| 1 | Cash | | | | |
| 2a | Trade notes and accounts receivable | | | 3,591,728 | |
| b | Less allowance for bad debts | ( ) | | ( ) | 3,591,728 |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities (see instructions) | | | | |
| 6 | Other current assets (att. stmt.) Stmt 3 | | 41,373,334 | | 41,110,501 |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments (attach stmt.) | | | | |
| 10a | Buildings and other depreciable assets | | | | |
| b | Less accumulated depreciation | ( ) | | ( ) | |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | ( ) | | ( ) | |
| 12 | Land (net of any amortization) | | | | |
| 13a | Intangible assets (amortizable only) | 1,297,777 | | 1,297,777 | |
| b | Less accumulated amortization | 259,555 | 1,038,222 | 519,111 | 778,666 |
| 14 | Other assets (attach stmt.) Stmt 4 | | 10,582,733 | | 83,128,562 |
| 15 | Total assets | | 52,994,289 | | 128,609,457 |
| | **Liabilities and Shareholders' Equity** | | | | |
| 16 | Accounts payable | | 11,072,497 | | 30,246,860 |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 | Other current liabilities (att. stmt.) Stmt 5 | | 43,182,496 | | 136,104,978 |
| 19 | Loans from shareholders | | | | |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | 800,000 | | |
| 21 | Other liabilities (attach statement) | | | | |
| 22 | Capital stock: a Preferred stock | | | | |
| | b Common stock | 1,000 | 1,000 | 1,000 | 1,000 |
| 23 | Additional paid-in capital | | | | |
| 24 | Retained earnings—Appropriated (att. stmt) | | | | |
| 25 | Retained earnings—Unappropriated | | -2,061,704 | | -37,743,381 |
| 26 | Adjustments to SH equity (att. stmt.) | | | | |
| 27 | Less cost of treasury stock | ( ) | | ( ) | |
| 28 | Total liabilities and shareholders' equity | | 52,994,289 | | 128,609,457 |

### Schedule M-1 — Reconciliation of Income (Loss) per Books With Income per Return

Note: Schedule M-3 required instead of Schedule M-1 if total assets are $10 million or more -- see instructions

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | | 7 | Income recorded on books this year not included on this return (itemize): | |
| 2 | Federal income tax per books | | | Tax-exempt interest $ | |
| 3 | Excess of capital losses over capital gains | | | | |
| 4 | Income subject to tax not recorded on books this year (itemize): | | 8 | Deductions on this return not charged against book income this year (itemize): | |
| | | | a | Depreciation $ | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize): | | b | Charitable contributions $ | |
| a | Depreciation $ | | | | |
| b | Charitable contributions $ | | 9 | Add lines 7 and 8 | |
| c | Travel and entertainment $ | | 10 | Income (page 1, line 28)—line 6 less line 9 | |
| 6 | Add lines 1 through 5 | | | | |

### Schedule M-2 — Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L)

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Balance at beginning of year | -2,061,704 | 5 | Distributions: | a Cash | |
| 2 | Net income (loss) per books | -35,681,677 | | | b Stock | |
| 3 | Other increases (itemize): | | | | c Property | |
| | | | 6 | Other decreases (itemize): | | |
| | | | 7 | Add lines 5 and 6 | | |
| 4 | Add lines 1, 2, and 3 | -37,743,381 | 8 | Balance at end of year (line 4 less line 7) | | -37,743,381 |

Form **1120** (2013)

DAA

TRISCSH2A TRI-STATE EMPLOYMENT SERVICES, INC.
████3600
FYE: 12/31/2013

**Federal Statements**

4/21/2015  3:31 PM

### Statement 4 - Form 1120, Page 5, Schedule L, Line 14 - Other Assets

| Description | Beginning of Year | End of Year |
|---|---:|---:|
| SECURITY DEPOSITS | $ 68,868 | $ 20,443 |
| BID DEPOSITS | 69,493 | |
| INVESTMENTS | 3,959,817 | 72,013,869 |
| LOANS RECEIVABLE | 6,370,385 | 3,586,112 |
| OTHER ASSETS | 114,170 | 14,170 |
| INVESTMENT IN AFFILIATES | | 7,493,968 |
| Total | $ 10,582,733 | $ 83,128,562 |

### Statement 5 - Form 1120, Page 5, Schedule L, Line 18 - Other Current Liabilities

| Description | Beginning of Year | End of Year |
|---|---:|---:|
| SALARIES PAYABLE | $ | $ 2,728,358 |
| PAYROLL TAXES WITHHELD | 40,325,982 | 64,882,560 |
| BANK OVERDRAFT | 2,506,514 | 7,886,220 |
| CUSTOMER DEPOSIT | 350,000 | 350,000 |
| BID PAYABLE | | 364,893 |
| OTHER PAYABLE | | 4,076 |
| WORKERS COMPENSATION PAYABLE | | 59,888,871 |
| Total | $ 43,182,496 | $ 136,104,978 |

4-5

TSEMPLOY 04/20/2015 2 05 PM

| Form **1120** | | **U.S. Corporation Income Tax Return** | | OMB No 1545-0123 |
|---|---|---|---|---|
| Department of the Treasury<br>Internal Revenue Service | | For calendar year 2013 or tax year beginning , ending<br>▶ Information about Form 1120 and its separate instructions is at www.irs.gov/form1120. | | **2013** |

**A Check if:**
1a Consolidated return (attach Form 851) ☐
b Life/nonlife consolidated return ☐
2 Personal holding co. (attach Sch. PH) ☐
3 Personal service corp (see instructions) ☐
4 Schedule M-3 attached ☒

TYPE OR PRINT

**Name**
TS EMPLOYMENT INC

**Number, street, and room or suite no If a P O box, see instructions**
160 BROADWAY 15TH FLOOR

**City or town, state, or province, country and ZIP or foreign postal code**
NEW YORK          NY 10038

**B Employer Identification number**
     9930

**C Date incorporated**
08/06/2010

**D Total assets (see instructions)**
$    21,959,823

**E Check if** (1) ☐ Initial return (2) ☐ Final return (3) ☐ Name change (4) ☐ Address change ☐

| | | | |
|---|---|---|---|
| **Income** | 1a Gross receipts or sales | 1a | 761,805,964 | |
| | b Returns and allowances | 1b | | |
| | c Balance. Subtract line 1b from line 1a | | 1c | 761,805,964 |
| | 2 Cost of goods sold (attach Form 1125-A) | | 2 | 750,985,207 |
| | 3 Gross profit. Subtract line 2 from line 1c | | 3 | 10,820,757 |
| | 4 Dividends (Schedule C, line 19) | | 4 | |
| | 5 Interest | | 5 | |
| | 6 Gross rents | | 6 | |
| | 7 Gross royalties | | 7 | |
| | 8 Capital gain net income (attach Schedule D (Form 1120)) | | 8 | |
| | 9 Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | 9 | |
| | 10 Other income (see instructions—attach statement) | | 10 | |
| | 11 **Total income.** Add lines 3 through 10 ▶ | | 11 | 10,820,757 |

| **Deductions (See instructions for limitations on deductions.)** | 12 Compensation of officers (see instructions—attach Form 1125-E) ▶ | 12 | |
|---|---|---|---|
| | 13 Salaries and wages (less employment credits) | 13 | 0 |
| | 14 Repairs and maintenance | 14 | 78,460 |
| | 15 Bad debts | 15 | |
| | 16 Rents | 16 | 16,565 |
| | 17 Taxes and licenses | 17 | 101,660 |
| | 18 Interest | 18 | 223,051 |
| | 19 Charitable contributions | 19 | |
| | 20 Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | 20 | |
| | 21 Depletion | 21 | |
| | 22 Advertising | 22 | 1,082 |
| | 23 Pension, profit-sharing, etc., plans | 23 | |
| | 24 Employee benefit programs | 24 | |
| | 25 Domestic production activities deduction (attach Form 8903) | 25 | |
| | 26 Other deductions (attach statement)          See Stmt | 26 | 9,981,560 |
| | 27 **Total deductions.** Add lines 12 through 26 ▶ | 27 | 10,402,378 |
| | 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | 28 | 418,379 |
| | 29a Net operating loss deduction (see instructions) | 29a | |
| | b Special deductions (Schedule C, line 20) | 29b | |
| | c Add lines 29a and 29b | 29c | |

| **Tax, Refundable Credits, and Payments** | 30 Taxable income. Subtract line 29c from line 28 (see instructions) | 30 | 418,379 |
|---|---|---|---|
| | 31 Total tax (Schedule J, Part I, line 11) | 31 | 36,608 |
| | 32 Total payments and refundable credits (Schedule J, Part II, line 21) | 32 | 36,000 |
| | 33 Estimated tax penalty (see instructions) Check if Form 2220 is attached ▶ ☒ | 33 | |
| | 34 **Amount owed.** If line 32 is smaller than the total of lines 31 and 33, enter amount owed | 34 | 608 |
| | 35 **Overpayment.** If line 32 is larger than the total of lines 31 and 33, enter amount overpaid | 35 | |
| | 36 Enter amount from line 35 you want. Credited to 2014 estimated tax ▶          Refunded ▶ | 36 | |

**Sign Here**
Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer   ROBERT CASSERA          Date          Title   PRESIDENT

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

| **Paid Preparer Use Only** | Print/Type preparer's name<br>IRWIN KOSSOFF | Preparer's signature<br>IRWIN KOSSOFF | Date<br>04/20/15 | Check ☐ if self-employed | PTIN<br>P00750650 |
|---|---|---|---|---|---|
| | Firm's name ▶   Kossoff & Kossoff, CPAs, LLP | | | Firm's EIN ▶     8450 | |
| | Firm's address ▶   3 Hatfield Ln<br>Goshen, NY          10924 | | | Phone no<br>845-294-1040 | |

For Paperwork Reduction Act Notice, see separate instructions.
DAA

Form **1120** (2013)

Form 1120 (2013)  **TS EMPLOYMENT INC**  █████ 9930  Page **5**

## Schedule L — Balance Sheets per Books

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1 Cash | | 239,000 | | 1,361,393 |
| 2a Trade notes and accounts receivable | 12,217,405 | | 20,543,643 | |
| b Less allowance for bad debts | | 12,217,405 | | 20,543,643 |
| 3 Inventories | | | | |
| 4 U.S. government obligations | | | | |
| 5 Tax-exempt securities (see instructions) | | | | |
| 6 Other current assets (att stmt) Stmt | | 11,000 | | 54,787 |
| 7 Loans to shareholders | | | | |
| 8 Mortgage and real estate loans | | | | |
| 9 Other investments (attach stmt) Stmt | | 14,285,919 | | |
| 10a Buildings and other depreciable assets | | | | |
| b Less accumulated depreciation | | | | |
| 11a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 12 Land (net of any amortization) | | | | |
| 13a Intangible assets (amortizable only) | | | | |
| b Less accumulated amortization | | | | |
| 14 Other assets (attach stmt.) | | | | |
| 15 Total assets | | 26,753,324 | | 21,959,823 |
| **Liabilities and Shareholders' Equity** | | | | |
| 16 Accounts payable | | 1,434,573 | | 80,013 |
| 17 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 Other current liabilities (att. stmt.) Stmt | | 20,574,058 | | 18,783,553 |
| 19 Loans from shareholders | | | | |
| 20 Mortgages, notes, bonds payable in 1 year or more | | | | |
| 21 Other liabilities (attach statement) Stmt | | 4,099,260 | | 2,372,059 |
| 22 Capital stock   a Preferred stock | | | | |
| b Common stock | 2,000 | 2,000 | 2,000 | 2,000 |
| 23 Additional paid-in capital | | 98,000 | | 98,000 |
| 24 Retained earnings—Appropriated (att. stmt.) | | | | |
| 25 Retained earnings—Unappropriated | | 545,433 | | 624,198 |
| 26 Adjustments to SH equity (att. stmt) | | | | |
| 27 Less cost of treasury stock | | ( ) | | ( ) |
| 28 Total liabilities and shareholders' equity | | 26,753,324 | | 21,959,823 |

## Schedule M-1  Reconciliation of Income (Loss) per Books With Income per Return

Note: Schedule M-3 required instead of Schedule M-1 if total assets are $10 million or more – see instructions

| | | | | |
|---|---|---|---|---|
| 1 Net income (loss) per books | | 7 Income recorded on books this year not included on this return (itemize): | | |
| 2 Federal income tax per books | | Tax-exempt interest $ | | |
| 3 Excess of capital losses over capital gains | | | | |
| 4 Income subject to tax not recorded on books this year (itemize): | | 8 Deductions on this return not charged against book income this year (itemize): | | |
| 5 Expenses recorded on books this year not deducted on this return (itemize): | | a Depreciation $ | | |
| a Depreciation $ | | b Charitable contributions $ | | |
| b Charitable contributions $ | | | | |
| c Travel and entertainment $ | | 9 Add lines 7 and 8 | | |
| 6 Add lines 1 through 5 | | 10 Income (page 1, line 28)—line 6 less line 9 | | |

## Schedule M-2  Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L)

| | | | | |
|---|---|---|---|---|
| 1 Balance at beginning of year | 545,433 | 5 Distributions:   a Cash | | |
| 2 Net income (loss) per books | 78,765 | b Stock | | |
| 3 Other increases (itemize): | | c Property | | |
| | | 6 Other decreases (itemize): | | |
| | | 7 Add lines 5 and 6 | | |
| 4 Add lines 1, 2, and 3 | 624,198 | 8 Balance at end of year (line 4 less line 7) | | 624,198 |

Form **1120** (2013)

DAA

TSEMPLOY TS EMPLOYMENT INC

**Federal Statements**

4/20/2015 2:11 PM

████9930

FYE: 12/31/2013

### Statement 1 - Form 1120, Page 1, Line 26 - Other Deductions

| Description | Amount |
|---|---|
| ADMINISTRATIVE FEE | $ 9,374,512 |
| BANK CHARGES | 144,268 |
| COMMISSIONS | 207,271 |
| COMPUTER EXPENSE | 35 |
| INSURANCE & BOND EXP | 78,744 |
| LEGAL AND PROFESSIONAL | 29,454 |
| OFFICE EXPENSE | 108,371 |
| BONDING | 12,824 |
| TRAVEL | 6,626 |
| MISCELLANEOUS | 7,591 |
| POSTAGE | 10,391 |
| 50% of Meals & Entertainment | 1,473 |
| Total | $ 9,981,560 |

### Statement 2 - Form 1120, Page 5, Schedule L, Line 6 - Other Current Assets

| Description | Beginning of Year | End of Year |
|---|---|---|
| PREPAID PAYROLL TAXES | $ 11,000 | $ 11,000 |
| DEF TAX ASSET | | 43,787 |
| Total | $ 11,000 | $ 54,787 |

### Statement 3 - Form 1120, Page 5, Schedule L, Line 9 - Other Investments

| Description | Beginning of Year | End of Year |
|---|---|---|
| CRD STOCKS | $ 14,285,919 | $ |
| Total | $ 14,285,919 | $ 0 |

### Statement 4 - Form 1120, Page 5, Schedule L, Line 18 - Other Current Liabilities

| Description | Beginning of Year | End of Year |
|---|---|---|
| ACCRUED PAYROLL | $ 8,177,144 | $ 11,950,711 |
| ACCRUED PAYROLL TAXES | 6,989,868 | 6,832,842 |
| BANK OVERDRAFT | 5,407,046 | |
| Total | $ 20,574,058 | $ 18,783,553 |

1-4

# EXHIBIT D

TS EMPLOYMENT INC 2014-2015
Balance Sheet
January 31, 2015

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | ASSETS | | | | | |
| 3 | | | | | | |
| 4 | Current Assets | | | | | |
| 5 | Chase_934129677 EXP | ($ 583,928 85) | | (583,928 85) | | |
| 6 | Chase-934-129669 P/R IOS | (239,007.40) | | (239,007 40) | | |
| 7 | WF 412 2124662 P/R AA | (638,819 59) | | (638,819 59) | | |
| 8 | WF 4128875358 SM | (24,445 20) | | (24,445 20) | | |
| 9 | WF 412 2124670 P/R DIAMOND | (1,473,443 97) | | (1,473,443.97) | | |
| 10 | SOVEREIGN 729 04950739 PR DIA | (229,954.91) | | (229,954.91) | | |
| 11 | SOVEREIGN 10027947240 | (2,109,621 05) | | (2,109,621 05) | | |
| 12 | WF 412 4001686 TS STAFFING | (3,610,879.70) | | (3,610,879 70) | | |
| 13 | WF 412 5513002 IOS | (467,618.90) | | (467,618 90) | | |
| 14 | CITI 998 7259395 PR CRD | 91,983 76 | | 91,983 76 | (9,285,735 81) | |
| 15 | Account Receivable-IOS | 5,628,048.26 | | | | |
| 16 | Account Receivable-TS STAFF SE | 32,305,629.69 | | | | |
| 17 | AR-ACCOUNABILITIES | 7,183,825.10 | | | | |
| 18 | AR-CRD | 5,515,563.65 | | | | |
| 19 | AR-CRS | (2,363,923.34) | | | | |
| 20 | AR-CRS-TRITEL | 43,966 29 | | | | |
| 21 | AR-DIAMOND | 9,950,460 72 | | | | |
| 22 | AR-ICG | 5,144,709 67 | | | | |
| 23 | AR-NATIONWIDE SCREENING | 41,414.06 | | | | 63,449,694 10 |
| 24 | NYS SUTA Ref Recvble CRD | 868,592 24 | | | | acc rec 1/31/15 |
| 25 | | | | | | |
| 26 | Total Current Assets | | 55,032,550.53 | | | |
| 27 | | | | | | |
| 28 | Property and Equipment | | | | | |
| 29 | | | | | | |
| 30 | Total Property and Equipment | | 0 00 | | | |
| 31 | | | | | | |
| 32 | Other Assets | | | | | |
| 33 | Prepaid Expenses | 2,699 09 | | | | |
| 34 | Suta Deposit-NH | 11,000 00 | | | | |
| 35 | Deferred Tax Asset | 42,369.00 | | | | |
| 36 | Workers Comp Collateral Deposi | 56,533,828 00 | | | | |
| 37 | | | | | | |
| 38 | Total Other Assets | | 56,589,896 09 | | | |
| 39 | | | | | | |
| 40 | Total Assets | | $ 111,622,446.62 | | | |

Unaudited - For Management Purposes Only

TS EMPLOYMENT INC 2014-2015
Balance Sheet
January 31, 2015

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 41 | | | | | | |
| 42 | | | | | | |
| 43 | | | | | | |
| 44 | LIABILITIES AND CAPITAL | | | | | |
| 45 | | | | | | |
| 46 | Current Liabilities | | | | | |
| 47 | Accounts Payable | $   5,396,534 02 | | 5,396,534 02 | | |
| 48 | Accounts Payable-OVERLOAD | (555,420.64) | | (555,420 64) | | |
| 49 | ACCRUED PAYROLL | 10,764,393 90 | | 10,764,393 90 | | |
| 50 | Accrued Payroll Taxes | 3,305,874.52 | | 3,305,874 52 | | |
| 51 | Accrued Expenses | 212,666 06 | | 212,666.06 | | |
| 52 | Corporation Taxes | 29,053 00 | | 29,053 00 | | |
| 53 | Federal & Fica Taxes Payable | 67,424,697 33 | | | | |
| 54 | Federal & Fica Taxes Payable | 26,817,242.83 | | | | |
| 55 | Federal & Fica Taxes Payable | 5,986,797 94 | | | | 100,228,738 10 |
| 56 | EFLEX FOR ALL | 41,637 88 | | 41,637.88 | | |
| 57 | Deductions-401K | 15,602 56 | | 15,602 56 | | |
| 58 | Deductions Payable | 571,987 78 | | 571,987 78 | | |
| 59 | Deduct Payable_Accountabilites | 40,459.70 | | 40,459 70 | | |
| 60 | Deduct Payable_CRD | 838 27 | | 838 27 | | |
| 61 | Deduct Payable_CRS | 41.69 | | 41 69 | | |
| 62 | Deduct Payable_Diamond | 23,320.96 | | 23,320.96 | | |
| 63 | Deduct Payable_ICG | 35 00 | | 35 00 | | |
| 64 | Deductions Payable_IOS | 753 83 | | 753 83 | | |
| 65 | Deduct Payable_STAFF | 17,380.01 | | 17,380.01 | | |
| 66 | Child Support Deductions | 141,902 91 | | 141,902 91 | | |
| 67 | C/S Ded_CRD | 30 81 | | 30 81 | | |
| 68 | Withholding Tax | 318,303.35 | | 318,303 35 | | |
| 69 | NY Withholding Tax | 324,674 16 | | 324,674.16 | | |
| 70 | NY Withholding Tax | 143,318 38 | | 143,318.38 | | |
| 71 | NY LOCAL W/H | 1.02 | | 1 02 | | |
| 72 | NY MTA Withholding Tax | 2,773.16 | | 2,773.16 | | |
| 73 | NY SDI ER tax | 13,152 95 | | 13,152 95 | | |
| 74 | NJ Withholding Tax | 323,772 25 | | 323,772 25 | | |
| 75 | NJ LOCAL Withholding Tax | 3,919 34 | | 3,919.34 | | |
| 76 | CA  Withholding Tax | 197,568.63 | | 197,568 63 | | |
| 77 | PA  Withholding Tax | 30,121.85 | | 30,121 85 | | |
| 78 | PA  LOCAL Withholding Tax | 11,617 44 | | 11,617 44 | | |
| 79 | PA OCCUPATION Writholding Tax | 1,041.10 | | 1,041.10 | | |
| 80 | PA  SCHOOL Withholding Tax | 580 01 | | 580 01 | | |
| 81 | VA  Withholding Tax | (2,398 16) | | (2,398 16) | | |
| 82 | DE Withholding Tax | 1,828 26 | | 1,828 26 | | |
| 83 | KS W/H TAX | 235.45 | | 235.45 | | |
| 84 | MA witholding tax | 268,630 93 | | 268,630 93 | | |

Unaudited - For Management Purposes Only

TS EMPLOYEE LEASING 2014-2015
Balance Sheet
January 31, 2015

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 85 | OH W/H TAX | 1,298 57 | | 1,298 57 | | |
| 86 | ND Withholding Tax | 12.56 | | 12.56 | | |
| 87 | MN Wrthholding Tax | (208 61) | | (208 61) | | |
| 88 | IA WITHHOLD TAX | 809 18 | | 809 18 | | |
| 89 | MO Wrthholding Tax | (290.38) | | (290.38) | | |
| 90 | MO LOCAL TAX | 288 43 | | 288 43 | | |
| 91 | AZ Wrthholding Tax | 8,623 09 | | 8,623 09 | | |
| 92 | NV Wrthholding Tax | 278 00 | | 278 00 | | |
| 93 | UT Withholding Tax | 10,885 36 | | 10,885 36 | | |
| 94 | WISC W/H TAX | 461 51 | | 461.51 | | |
| 95 | ME Wrthholding Tax | 2,403 78 | | 2,403 78 | | |
| 96 | D C. Wrthholding Tax | 1,082 47 | | 1,082 47 | | |
| 97 | CO W/H TAX | 4,121 87 | | 4,121 87 | | |
| 98 | CO OCCUPATION TAX | 64 50 | | 64 50 | | |
| 99 | CT Wrthholding Tax | 211 35 | | 211.35 | | |
| 100 | MI W/H TAX | 5,386 76 | | 5,386 76 | | |
| 101 | OK Wrtholding Tax | 2,979.12 | | 2,979.12 | | |
| 102 | IL WITHHOLD TAX | (12,823 24) | | (12,823.24) | | |
| 103 | MD WITHHOLDING TAX | 17,778 03 | | 17,778 03 | | |
| 104 | MD LOCAL WITHHOLDING | 275.90 | | 275.90 | | |
| 105 | NC Wrthholding Tax | 10,599 21 | | 10,599 21 | | |
| 106 | MS W/H TAX | 12 00 | | 12 00 | | |
| 107 | OR Wrtholding Tax | 1,708 42 | | 1,708.42 | | |
| 108 | OR COUNTY Wrthholding Tax | 1,880 16 | | 1,880 16 | | |
| 109 | SC Wrthoulding tax | 29,040 47 | | 29,040.47 | | |
| 110 | WV wrthholding tax | 3,228 42 | | 3,228 42 | | |
| 111 | NE W/H TAX BAL OK | 495.90 | | 495.90 | | |
| 112 | KY W/H TAX | 9,175 03 | | 9,175 03 | | |
| 113 | AL W/H TAX | 674 37 | | 674 37 | | |
| 114 | AL local W/H TAX | 26 54 | | 26.54 | | |
| 115 | GA Wrtholding Tax | 27,787 18 | | 27,787 18 | | |
| 116 | AR Wrthholding Tax | 3,880 54 | | 3,880 54 | | |
| 117 | RI Wrthholding Tax | 10,303 11 | | 10,303 11 | | |
| 118 | LA W/H TAX | 1,109.00 | | 1,109.00 | | |
| 119 | NM W/H TAX | 209 19 | | 209 19 | | |
| 120 | IN W/H TAX | 9,460 43 | | 9,460 43 | | |
| 121 | IN LOC TAX | 235.87 | | 235.87 | | |
| 122 | CA SDI payable | 15 50 | | 15 50 | | |
| 123 | UT SDI PAYABLE | 52 86 | | 52.86 | | |
| 124 | NJ SDI payable | 769,222 49 | | 769,222 49 | | |
| 125 | TN SDI PAYABLE | 18.06 | | 18.06 | | |
| 126 | PA_SDI PAYABLE | 18 99 | | 18 99 | | |
| 127 | Suspense Acct Payable??? | 19,586.94 | | 19,586.94 | | |
| 128 | FUTA Tax Payable | 73,567 47 | | 73,567 47 | | |
| 129 | FUTA Tax Payable | (5,438,066 67) | | (5,438,066.67) | | |
| 130 | FUTA Tax Payable | (256,644 36) | | (256,644 36) | | |
| 131 | FUTA Payable_IOS | 79 22 | | 79 22 | | |
| 132 | FUTA Payable_TS STAFFING | 3,265,014 15 | | 3,265,014 15 | | |
| 133 | FUTA Payable_ACCOUNTABILITES | 658,955 63 | | 658,955 63 | | |
| 134 | FUTA Payable_CRD | 393,632 77 | | 393,632 77 | | |
| 135 | FUTA Payable_CRS | 225.39 | | 225 39 | | |
| 136 | FUTA Payable_CRS/TRITEL | (169 19) | | (169 19) | | |
| 137 | FUTA Payable_DIAMOND | 2,077,982 60 | | 2,077,982 60 | | |
| 138 | FUTA Payable_ICG | 53,262 29 | | 53,262 29 | | |
| 139 | Sales Tax Payable | (3,876 80) | | (3,876 80) | | |

Unaudited - For Management Purposes Only

TS EMPLOYMENT INC 2014-2015
Balance Sheet
January 31, 2015

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 140 | DE ETT | 258.63 | | 258 63 | | |
| 141 | AZ Special Assessment tax | 360.17 | | 360 17 | | |
| 142 | NV Busmess Tax Payable | 53,902 85 | | 53,902 85 | | |
| 143 | NH Business Tax Payable | 24,398 58 | | 24,398 58 | | |
| 144 | SUTA Tax Payable | 598,822.94 | | 598,822.94 | | |
| 145 | NY SUTA Tax Payable | 203,888 14 | | 203,888 14 | | |
| 146 | NJ SUTA Tax Payable | 147,929 72 | | 147,929 72 | | |
| 147 | CA SUTA Tax Payable | 1,771,563.62 | | 1,771,563 62 | | |
| 148 | PA SUTA Tax Payable | 10,343 47 | | 10,343 47 | | |
| 149 | VA SUTA Tax Payable | (1,441 95) | | (1,441 95) | | |
| 150 | DE SUTA Tax Payable | 1,110 92 | | 1,110.92 | | |
| 151 | KS SUTA Tax Payable | 376 52 | | 376 52 | | |
| 152 | MA SUTA Tax Payable | 518,181.06 | | 518,181.06 | | |
| 153 | OH SUTA Tax Payable | 13,160 92 | | 13,160 92 | | |
| 154 | TN SUTA Tax Payable | 17,251.27 | | 17,251.27 | | |
| 155 | MN SUTA Tax Payable | (1,114 34) | | (1,114 34) | | |
| 156 | IA SUTA Tax Payable | 854.22 | | 854.22 | | |
| 157 | MO SUTA Tax Payable | (1,677 30) | | (1,677 30) | | |
| 158 | AZ SUTA Tax Payable | (7,711 28) | | (7,711.28) | | |
| 159 | NV SUTA Tax Payable | (12,791 43) | | (12,791 43) | | |
| 160 | UT SUTA Tax Payable | 12,868 80 | | 12,868.80 | | |
| 161 | WI SUTA Tax Payable | 1,636 22 | | 1,636 22 | | |
| 162 | SD SUTA Tax Payable | (19 85) | | (19 85) | | |
| 163 | ME SUTA Tax Payable | (5,400 19) | | (5,400 19) | | |
| 164 | DC SUTA Tax Payable | 3,722 04 | | 3,722.04 | | |
| 165 | CO SUTA Tax Payable | (7,654 09) | | (7,654 09) | | |
| 166 | CT SUTA Tax Payable | 13,808 14 | | 13,808 14 | | |
| 167 | MI SUTA Tax Payable | 16,753 95 | | 16,753.95 | | |
| 168 | OK SUTA Tax Payable | 6,740 63 | | 6,740 63 | | |
| 169 | IL SUTA Tax Payable | 145,050 46 | | 145,050 46 | | |
| 170 | MD SUTA Tax Payable | 22,888.98 | | 22,888.98 | | |
| 171 | NC SUTA Tax Payable | 27,190 72 | | 27,190 72 | | |
| 172 | MS SUTA Tax Payable | 228.30 | | 228 30 | | |
| 173 | OR SUTA Tax Payable | 3,764 05 | | 3,764 05 | | |
| 174 | SC SUTA Tax Payable | 25,857 80 | | 25,857 80 | | |
| 175 | WV SUTA PAYABLE | 1,557 08 | | 1,557 08 | | |
| 176 | NE SUTA Tax Payable | 2,153 92 | | 2,153 92 | | |
| 177 | WA SUTA Tax Payable | 5,556 43 | | 5,556 43 | | |
| 178 | KY SUTA Tax Payable | 14,706.51 | | 14,706 51 | | |
| 179 | AL SUTA Tax Payable | 1,415 34 | | 1,415 34 | | |

Unaudited - For Management Purposes Only

TS EMPLOYMENT INC 2014-2015
Balance Sheet
January 31, 2015

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 180 | GA SUTA Tax Payable | 33,032.51 | | 33,032 51 | | |
| 181 | AR SUTA PAYABLE | 1,747.71 | | 1,747 71 | | |
| 182 | RI SUTA Tax Payable | 26,202 07 | | 26,202.07 | | |
| 183 | LA SUTA Tax Payable | 1,462.91 | | 1,462 91 | | |
| 184 | NM SUTA Tax Payable | 424 30 | | 424 30 | | |
| 185 | ID SUTA Tax Payable | 0 22 | | 0.22 | | |
| 186 | IN SUTA Tax Payable | (20,331.58) | | (20,331 58) | | |
| 187 | SD SUTA Tax Payable | 17 58 | | 17 58 | | |
| 188 | NH SUTA Tax Payable | 3,325 60 | | 3,325 60 | | |
| 189 | FL SUTA Tax Payable | 57,012 52 | | 57,012 52 | | |
| 190 | TX SUTA Tax Payable | 36,876 67 | | 36,876.67 | | |
| 191 | ND SUTA Payable | 57.87 | | 57 87 | | |
| 192 | Other Current Liabilities | 2 43 | | 2 43 | 27,182,896.59 | |
| 193 | | | | | | |
| 194 | Total Current Liabilities | | 127,411,634 69 | | | |
| 195 | | | | | | |
| 196 | Long-Term Liabilities | | | | | |
| 197 | DUE To/From ServiceS | 29,129,698 92 | | | | |
| 198 | Due to/from STS GROUP | (271 49) | | | | |
| 199 | Due/To From E | (3,363,818 86) | | | | |
| 200 | Due/To From BROADWAY PEO | (1,970,711 04) | | | | |
| 201 | Due/To From TS HEALTH | 9,281,400 00 | | | | |
| 202 | | | | | | |
| 203 | Total Long-Term Liabilities | | 33,076,297.53 | | | |
| 204 | | | | | | |
| 205 | Total Liabilities | | 160,487,932 22 | | | |
| 206 | | | | | | |
| 207 | Capital | | | | | |
| 208 | Additional Paid In Capital | 98,000.00 | | | | |
| 209 | Capital Stock | 2,000 00 | | | | |
| 210 | Retained Earnings | (49,500,716 81) | | | | |
| 211 | Net Income | 535,231 21 | | | | |
| 212 | | | | | | |
| 213 | Total Capital | | (48,865,485 60) | | | |
| 214 | | | | | | |
| 215 | Total Liabilities & Capital | | $ 111,622,446 62 | | | |
| 216 | | | | | | |

Unaudited - For Management Purposes Only